[No. D003778. Fourth Dist., Div. One. July 13, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL STEVEN CAPLAN, Defendant and Appellant.

COUNSEL

Ross Thomas, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Frederick R. Millar, Jr., and Rudolf Corona, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BUTLER, J.**—The trial court found Daniel Steven Caplan guilty of having Cindy B., a child under 14 years old and more than 10 years younger than

him, orally copulate him on 2 separate occasions (Pen. Code,[1] § 288a, subd. (c)), or, alternately, that Caplan committed 2 acts of lewd and lascivious conduct upon Cindy (§ 288, subd. (a)). The court sentenced Caplan to a total of three years in prison. He appeals, contending the trial court prejudicially erred when it refused to allow discovery of and introduction into evidence of Cindy's psychiatric history and there was insufficient evidence to support the convictions. We shall conclude there was sufficient evidence to support the convictions and the trial court erred in its evidentiary rulings. We therefore reverse and remand with instructions.

## I

We first set out the facts in the light most favorable to the judgment.

## A.

In March 1983, Cindy, almost six years old, and her younger sister Charity were removed from the foster care of Caplan's home and placed for adoption in Jack and Beverly B.'s home. Cindy was at first very distant and cold and refused all affection from her new parents. She made phone calls to the Caplans and didn't understand why she had to leave the Caplan home. She appeared sexually confused and displayed acts of sexually aberrant behavior.[2] Jack and Beverly became concerned and put Cindy under Dr. Brennan's psychiatric care.

In January 1984, Cindy's adoption became final. Several months later she and Beverly were in the kitchen talking. Cindy asked Beverly why her birth mom did not retain custody of her. Beverly told Cindy that sometimes drug and alcohol problems cause parents to abuse their children. Cindy, who rarely cried, began crying. Beverly wanted to know why, what was wrong? Cindy said she couldn't tell because she was afraid her adoptive parents would think she was bad and send her away. After Beverly assured Cindy she would not be sent away and promising her not to tell anyone what she said, Cindy stated Caplan had done some bad things to her: he made her suck his penis in a hallway, he stuck his finger in her vagina, and he put his penis against her and it hurt; he put it in and it made her bleed. Cindy said Caplan's wife Debbie had come down the hallway and caught them in one act of sucking Caplan's penis and she screamed at Cindy to go back to bed.

---

[1] All statutory references are to the Penal Code unless otherwise specified.

[2] Cindy always wanted to be the boy or daddy when playing with her sister, she tried urinating standing up for the first couple of months in her adoptive home, she didn't understand why she couldn't watch her new daddy urinate, and on at least one occasion she ran naked from the bathroom after her bath, flopped down on the living room carpet and spread her legs in front of Beverly and her nephew.

Cindy said Caplan then didn't like her any more and made her leave the house. Cindy did not tell Beverly about these acts earlier because she was afraid she would not be adopted. After revealing these facts, Cindy's demeanor changed, she opened up with Beverly and Jack and became affectionate and warm.

On May 1, 1984, Beverly reported Caplan's criminal acts to the police. Sheriff's Deputy Kenneth Edward Williams then interviewed Cindy. On June 27, 1984, another deputy sheriff, Harold Wayne Simmons, interviewed Cindy, this time with the use of anatomically correct dolls. Although the versions given the two deputies varied in certain respects, Cindy was consistent in her complaints Caplan put his penis against her vagina, inserted his finger in her vagina, had her suck his penis on different occasions, and Debbie found Cindy in the hallway with Caplan. Neither deputy prompted any of Cindy's answers to questions and both thought Cindy was telling the truth.

Cindy was then examined by Dr. Marilyn Kaufhold, a pediatrician at Children's Hospital specializing in child sexual abuse cases. After talking with Beverly and Cindy and conducting a physical examination, Kaufhold concluded Cindy had been sexually abused. Kaufhold had earlier examined Cindy in 1982 when Debbie Caplan had brought her to the hospital because of suspected sexual abuse. Kaufhold did not then find evidence of sexual abuse. In retrospect, she reversed this earlier finding, stating Cindy's previous quick responses of no's to any abuse questions were not unusual since she was still in the Caplan home, and appeared to be protecting herself from any harm that might happen when she returned to the home.

After further investigation, the People charged Caplan November 8, 1984, with committing six criminal sexual acts upon Cindy and two such acts upon another young girl. The granting of a pretrial motion severed the counts involving Cindy from those involving the other child. The People proceeded to try the case involving Cindy first and Caplan, with his attorney's consent, waived a jury trial.

### B.

At trial, Cindy's foster home background unfolded. In 1980, Cindy and Charity were placed with foster parents Jerilyn and Chester Allison. They remained in the Allison home nine months, until the summer of 1981, when the Allisons relinquished custody of the children because Cindy wasn't making progress adjusting to their home. Jerilyn testified Cindy seemed withdrawn, uncommunicative and depressed. She became increasingly so when the natural mother failed to fulfill promises to visit Cindy and also

when her grandmother died. Jerilyn also testified Cindy exhibited some hostile behavior toward her natural father, saying he kicked her in the leg and she would return as the "Incredible Hulk" and get him.

Unfortunately, the Allisons' relationship with Cindy started off on the wrong foot. On her first night at their home, Mr. Allison accidently pulled too hard on her clothes while changing her and she fell forward and struck her eye on an open dresser drawer. Chester stated the incident left Cindy badly bruised and in shock; she vomited and cried after the incident.

Later in the summer of 1981, Cindy and Charity went to live with Caplan and his family. The Caplans had started taking in foster children in 1979 with the intention of adopting them. Their first child, Martin, who was the same age as Cindy, was already in the home when Cindy arrived. In January 1982, Keisha and Aaron, both under the age of four, also came to live in the Caplan home.

Debbie Caplan testified when Cindy first arrived she suffered from chronic nightmares, believed in and feared monsters, was withdrawn and did not like to be touched, had a male fixation and was very competitive. Cindy's honesty was also questioned.

Debbie related Cindy often stood like a boy to go to the bathroom, one time put a drum stick in her pants to make it look like she had a penis, on more than one occasion she rubbed her vaginal area, complaining of itching, and rubbed her vaginal area on a padded corner of the fireplace. Debbie stated that during the family bean-bag discussions Cindy used to tell about her birth parents making love. Debbie also described one incident where Martin and Cindy sucked each other's breasts after seeing a visitor nurse her baby. In an attempt to curtail Cindy's preoccupation with sex, Debbie taught all the children the proper terms for penis and vulva and sought psychological help for Cindy.

Cindy's competitiveness was shown when she pulled out part of her capped tooth when Martin lost a tooth. Her ability to tell the truth was questioned when she told Debbie her former foster parent, Mr. Allison, didn't like her, he had kicked her in the face and had called her an animal. An investigation proved these claims untrue.

After Cindy had been in their home for a while, Debbie observed Caplan was more openly affectionate and demonstrative with Cindy than with the other children. In September 1982, Debbie grew suspicious of Caplan's behavior because Cindy would get too much lap time when they watched television and Caplan would give Cindy long embraces and kisses. She also

became concerned about a redness on Cindy's bottom she noticed while bathing Cindy. Her suspicions were heightened when she awoke one morning around 6 a.m., got up and found Caplan and Cindy alone in the hallway with Caplan rubbing Cindy's back. Debbie angrily told Cindy to go to her room and get dressed. Debbie explained the incident made her mad because she felt Cindy was getting inappropriate additional attention. She suspected molest, but never saw any. She felt her suspicions might be due to stress and anxiety at home because of her illness, five small foster children, one with serious medical problems, and marital problems with Caplan.

Because Debbie suffered from lupus erythematosus, she kept regular monthly medical appointments with nurse practitioner Mary Rose Mueller. In October 1982, Debbie related her suspicions to Mueller. Mueller testified Debbie suspected Caplan was sexually molesting Cindy. She questioned her about the cause of Cindy's redness and swelling. Debbie told Mueller about Caplan's overly physical display of affection with Cindy and about awakening one night to see Caplan coming out of Cindy's bedroom after everyone had gone to bed. Mueller advised Debbie to take Cindy to a pediatrician for a physical examination to determine whether she in fact was being molested. Mueller also told Debbie the redness and swelling could have been caused by pinworms.

At the next monthly appointment, Mueller asked Debbie if she had taken Cindy to a doctor to be examined. Getting a negative response, after the meeting, Mueller discussed the possible molest with her superiors and was advised to file a report of suspected child abuse. She did so two days later and called Debbie to inform her of the action. Debbie responded, "I thought [or knew] you would do that."

Thereafter, Debbie confronted Caplan with her suspicions and took Cindy to Dr. Stone for a physical examination. After a cursory examination, Dr. Stone directed Debbie to take Cindy to Children's Hospital for a more thorough examination. Dr. Kaufhold there examined Cindy and noted redness, swelling and tenderness to Cindy's rectal and vaginal areas. She attributed the symptoms to possible pinworms and improper wiping. She based her findings on the lack of any verbal history of suspected abuse and Cindy's statement to her she didn't wipe good.

Following the examination, Debbie's suspicions continued and she undertook regular checks of Cindy's vaginal and rectal areas as well as her underwear for signs of semen or blood. Debbie contacted Cindy's social worker, Grace Blaszkowski, to see if Cindy and her sister could be moved. She told Blaszkowski she had her hands full with the other children.

Blaszkowski testified she reviewed the placement choices and in discussions about the move found Cindy anxious about moving from the Caplan home and not understanding why she had to leave. Cindy never indicated to her she was being molested there. Nor did Debbie ever tell Blaszkowski about the possible molest. She heard about the molest from Mueller, who reported it, and in a phone conversation with Caplan found him upset with Debbie for saying he had molested Cindy. Still, Cindy cried when she left the Caplan home and Blaszkowski noted there were some adjustment problems with Cindy after the move to her adoptive home.

## C.

Cindy testified. She described four times Caplan sexually abused her and marked a diagram of the house showing three locations for the molests: the hallway, her bedroom and downstairs by the coats and shoes.

Cindy recalled Caplan taking her from her bedroom to the hallway and putting his penis in her mouth and making her suck it. She was in her pajamas and Caplan was in a robe. Debbie came down the hall and saw them and yelled at Cindy to go to her room. Cindy then thought she was in trouble and went to her room.

On another occasion, Cindy said, Caplan took her to an area downstairs below the stairwell where coats and shoes were stored. There, he again made her put his penis in her mouth and suck it. He had her stop when he heard Martin coming down the stairs.

Then during another night while she was in bed he made her suck his penis and he put his finger and penis in her vagina. Putting his penis in her hurt and made her bleed. When questioned how he put his penis in her vagina, Cindy said he "scooted up" or "like pushed his" penis to get in while he was sitting up.

Cindy was unclear whether Caplan did something bad to her three or four times. She explained she didn't tell anyone about the sexual acts when she lived at the Caplans because Caplan told her he would spank her. She stated he told her to say she "didn't wipe good" when she went with Debbie to the doctor for the physical examination. Following the examination, Cindy felt Caplan changed toward her, he would no longer interact and play with her like the other children.

Cindy finally told her adopted mother about the sexual acts with Caplan. She waited until after the adoption was final because she thought Beverly would be mad and think she was bad.

On cross-examination, Cindy contradicted some of her earlier statements to Beverly and Deputies Williams and Simmons. She said the finger episode occurred after her physical examination whereas she told Beverly nothing happened after the examination. She also said she never told anyone she had been abused from the time she arrived at the Caplan home until she left, that Caplan sexually abused all of the children in the home, and that Caplan had put his penis on her back.

### D.

Caplan testified in his own defense, corroborating much of his wife's testimony. He initially left Cindy alone when she arrived at their home but became more attentive in an effort to draw her out of her shell and increase her self-esteem. Until Mueller's phone call to his wife, Caplan had no idea his wife suspected him of sexual abuse.

Caplan portrayed Cindy as a difficult child who didn't interact well with other children at school, who was resentful of two younger foster children brought into the Caplans' home after she had been there almost six months, who was aggressive and pushy, always trying to be first and get more attention than the other children, and who was often caught lying.

Even though the results of Dr. Kaufhold's examination of Cindy did not conclude she had been sexually molested, Caplan had no further contact with Cindy after she returned to his home. He dropped her "like a hot potato," concerned any contact with Cindy would be misconstrued.

When questioned about the hallway incident, Caplan had little memory of such. He recalled Cindy was crying early one morning and he took her from her bed, so as not to wake the other children, into the hallway to comfort her and ask her about her nightmare. Caplan generally denied committing the charged offenses and had no idea why Cindy would accuse him of such conduct.

### E.

Following a parade of defense witnesses,[3] a recess in the trial for the taking of a colposcope, a detailed enlarged photograph of Cindy's vaginal

---

[3] Most notably, the defense called Dr. Robert Littman, a psychiatrist, who reviewed a large bulk of material concerning Cindy's background and opined Cindy was at risk of having serious emotional problems which would tend to cause her to distort, misperceive, exaggerate or lie in a premeditated fashion. The defense also called Dr. Thomas Rodgers, another psychiatrist, who examined Caplan in 2 one-hour sessions, and concluded he was not a sexually disordered person.

area, further expert testimony by Drs. Kaufhold, Bruce Woodling, Herbert Giese, and Mark Goodman, further rebuttal testimony, and closing argument of counsel, the court made the following comments while ruling on Caplan's guilt: "There are a great many human beings who are affected by the court's decision in this case. While I would be lying if I said I didn't consider that, the issue before this court, and the only issue before this court, is the guilt or non-guilt of Mr. Caplan. There is no other issue, however sensitive I might be about the circle of individuals who are affected by the decision in either direction.

"Let's begin with the expert testimony for a moment. . . . The people who testified before this court as physicians and experts in regard to the determination of abuse of children are all experts. I would not question the commitment or the expertise of any of the four of them. They are going to know more a year from now than they know now and they are going to know more five years from now than they know now, but they know a tremendous amount more now than they did in 1982 or any earlier date, Dr. Kaufhold at the beginning of 1979.

"They all four agree, and Dr. Berkowitz agrees as well, that there was evidence of abuse of Cindy . . . . There is no question that the child has suffered abuse of some kind to the hymen.

"The only person who saw Cindy in 1984 and indeed in 1985 and in 1982 is Dr. Kaufhold. The others worked from photographs with the limitations that are involved.

"[Defense counsel] Mr. Hallen's argument accepts the direct testimony of Drs. Giese and Goodman that there was an increase in the evidence of abuse or molest from '84 to '85 and that was the direct testimony and there is no question about that. But there was substantial cross. The court asked questions and I think that both doctors backed away from their determination after looking at the '84 photographs and the letter of Dr. Berkowitz. Now, to lessening degrees there is still with those two experts, I believe, a conviction that there was abuse between '84 and the taking of the colposcopic photographs.

"One thing that has not been argued by anyone, the oral copulation counts have absolutely nothing to do with these expert witnesses. It doesn't stand for anything, because there is no evidence through examination that can be found out about the alleged oral copulation. The only evidence in that regard is testimony. There is no expert evidence whatsoever and cannot be that I'm aware of. It wasn't presented to the court if there is any such.

"I do not believe that this court or any other court needs to understand the psychological makeup of the person who will molest children in order to find guilt. If that were so, you couldn't try a case of this type without substantial expert witnesses or the training of judges as psychologists and psychiatrists.

"My experience, of which both counsel are aware and I believe Mr. Caplan was aware when there was a waiver of the jury, is a substantial background in the family law area with numerous allegations of molestation of children. I don't come to this court fresh and new without any concept of the kind of allegations and the work of psychiatrists and psychologists in the field of alleged child molest.

"The reason I asked Tom Rodgers whether he could define a child molester and whether it wasn't true that child molesters come from every part of the community and every occupation is because that was my honest belief. I wanted to find out if a witness in this case thought that was correct.

"I don't have the ability, and neither does anyone else, to go out on the street and have 100 people come by and being told that 20 of those are child molesters to select those 20. I couldn't do it out of 30, except by chance, because child molesters don't look different than other people. Therefore, I don't think that they testify differently. I don't think their demeanor is of a great deal of value in terms of who is and who is not.

"This goes directly to the argument—and credit should be given where it is due—to the fact that Mr. Caplan apparently has no prior record. I'm unaware of it. He apparently is a hard-working individual.

"The defense argument is based on the assumption that Dr. Kaufhold was correct when she found no molest in 1982. That may be true. She is an expert, and I've so found.

"The psychopolitics involved in molest allegations in both civil and criminal matters are overwhelming. They are exceedingly difficult. Do we assume that a child is always a liar? Do we assume that children only tell the truth? I don't think so, I don't think we accept either one of those. I think trials are necessary if they can't be solved, if the issue can't be solved in any other way so that the court uses its best effort, honest effort, to determine whether or not the victim is telling the truth.

"That brings us to Cindy, or Cynthia. Her preliminary hearing testimony was taken in October, late October. She testified in this court in late May. I've read both testimony. I had read the preliminary hearing transcript in

advance of her testimony in this trial. I've read both during the trial and I've read them again in anticipation of this argument.

"I'm confused by some portions of her testimony. I don't disagree with Mr. Hallen that in some respects there's confusion in her [testimony]. But as far as I can see, she never deviated from the issue that Mr. Caplan had her take his penis in her mouth on two occasions, one is in the hallway upstairs near the living room and the other is downstairs by the shoes." The court then found Caplan guilty beyond a reasonable doubt of two counts of section 288, subdivision (a), or, in the alternative, section 288a, subdivision (c). As to the other two counts, the court stated: "[The] one [count] in the bedroom, I cannot find beyond a reasonable doubt that there was a violation of either Penal Code section in that regard. The fourth count, which was supposed to be in what I would characterize as the family recreation room, there was so little testimony and it was so confusing that I am unable to make a finding of guilt beyond a reasonable doubt on that count." The court clarified its ruling as finding guilt on the two counts involving oral copulation "under what [it believed were] parallel criminal provisions as to this particular fact situation because of the age of the child."

## II

*In limine,* and continuing throughout the trial, Caplan sought discovery of Cindy's psychiatric records and the testimony of three psychotherapists who treated her as a patient before, during and after the complained-of sexual abuse; Dr. Susan Harradon-Trowbridge and Dr. LeLievre treated her before and during the alleged abuse and Dr. Brennan treated her after such acts and during the trial. After in-depth argument before trial, the court, relying on a totality of privileges,[4] ruled Cindy's psychotherapist-patient privilege was paramount and concluded none of the psychiatric evidence could be used against her. The court ruled none of the psychotherapists who had treated Cindy would be allowed to testify as to matters covered by the privilege; that her confidential communications made in the course of her treatments were protected absent some exception. The court then denied Caplan's motion for discovery of Dr. Brennan's records.

Although the court recognized the evidence was indeed relevant, it believed it had little or no authority to override Cindy's claim of privilege. Caplan's continued attempts to discover and bring in evidence concerning Cindy's statements or lack of statements concerning his abuse of her or

---

[4] The court stated it was ruling in conjunction with the strong legislative intent to protect victims of crimes, i.e., the prohibition of ordering psychiatric evaluation of sexual assault victims (§ 1112), the inability to use in evidence polygraph results, and restitution to victims. The court also noted the victim's constitutional right to privacy.

statements made for preparation of her testifying at trial, were stonewalled by the court.

■■■ On appeal, Caplan claims these rulings were erroneous and prejudicial; they prevented him from effectively cross-examining witnesses, from calling witnesses who might have been helpful to his defense, and from fully confronting Cindy about her complaint and testing her competency and credibility. Caplan argues the facts of his case demand we find the trial court erred in finding Cindy's privilege paramount to his right of confrontation and his right to present a defense. We so find.

The parties and trial court lump all the evidentiary problems into one neat pile pitting Caplan's constitutional right of confrontation against Cindy's constitutional right of privacy claimed via her privilege. The issues, however, are not all that clear cut as evidenced by the trial court's comments it didn't understand the scope of the privilege in light of the child abuse reporting statutes and "[t]he court of appeal will get their turn." It's now our turn.

We start with a review of the relevant statutes. Evidence Code section 1014 provides in part: "[T]he patient, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist . . . ." ■■■ As our Supreme Court in *People* v. *Stritzinger* (1983) 34 Cal.3d 505 [194 Cal.Rptr. 431, 668 P.2d 738] noted, this privilege is not absolute. While it is normally broadly construed in favor of the patient *(Grosslight* v. *Superior Court* (1977) 72 Cal.App.3d 502 [140 Cal.Rptr. 278]) and has been recognized as an aspect of the patient's constitutional right to privacy (Cal. Const., art. I, § 1; *In re Lifschutz* (1970) 2 Cal.3d 415, 431-432 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1]), it may yield in the furtherance of compelling state interests *(Britt* v. *Superior Court* (1978) 20 Cal.3d 844, 855 [143 Cal.Rptr 695, 574 P.2d 766]).

Evidence Code section 1027 states the privilege does not exist if: "(a) [t]he patient is a child under the age of 16 [and] (b) [t]he psychotherapist has reasonable cause to believe that the patient has been the victim of a crime and that disclosure of the communication is in the best interest of the child." The Law Revision Commission Comment to Evidence Code section 1027 tells us the exception is "necessary to permit court disclosure of communications to a psychotherapist by a child who has been the victim of a crime (such as child abuse) in a proceeding in which the commission of such crime is a subject of inquiry. Although the exception . . . might inhibit the relationship between the patient and his psychotherapist to a limited extent, it is essential that appropriate action be taken if the psychotherapist be-

comes convinced during the course of treatment that the patient is the victim of a crime and that disclosure of the communication would be in the best interest of the child."[5]

Under the Child Abuse Reporting Act (§ 11165 et seq.), section 11166 requires: "[A]ny child care custodian, medical practitioner, nonmedical practitioner, or employee of a child protective agency who has knowledge of or observes a child in his or her professional capacity . . . whom he or she knows or reasonably suspects has been the victim of child abuse shall report the known or suspected instance of child abuse to a child protective agency immediately or as soon as practically possible by telephone and shall prepare and send a written report thereof within 36 hours of receiving the information concerning the incident." Child abuse under the act includes "the sexual abuse of a child" (§ 11165, subd. (g)), and "medical practitioner" includes licensed psychiatrists and psychologists (§ 11165, subd. (i)). The scope and substance of the reporting requirement are set out in section 11167. These sections impose an affirmative duty on psychotherapists to report all known and suspected instances of child abuse. Section 11171, subdivision (b), explicitly provides an exception to the psychotherapist-patient privilege: "Neither the physician-patient privilege nor the psychotherapist-patient privilege applies to information reported pursuant to this article in any court proceeding or administrative hearing." Section 11167, subdivision (b), additionally provides the psychotherapist may report "[i]nformation relevant to the incident of child abuse" beyond the fact of the incident itself.

We view the exception in Evidence Code section 1027 as another vehicle through which the psychotherapist who is treating a child under the age of 16 and has some reason to believe child abuse is ongoing or has occurred discloses such information both to satisfy the mandatory reporting requirements and to further the best interests of the child. Contrary to the trial court's position in this case, the section goes "in only one direction," we presume the "best interests of the child" covers more than the mere allegations of wrongdoing against a particular person. Seeking the truth of those allegations would appear to be in the best interests of the child for appropriate treatment. ■ We thus interpret Evidence Code section 1027 as a limited removal of the child-patient's privilege and placement with the psychotherapist who treated the child at the time the requirements of the exception were met. The psychotherapist, not the child, is the one who must claim the privilege by stating the disclosure is not in the best interests of the

---

[5] Interestingly, neither Caplan nor the People discussed this section at trial. The court below mentioned it but thought the exception did not apply. After oral argument in this matter, we asked the parties to brief the issue whether Evidence Code section 1027 applies in this case.

child. Such construction balances the competing state interests of detecting and preventing child abuse on the one hand and "[t]he state's interest in facilitating the ascertainment of truth in connection with legal proceedings" on the other. *(Jones* v. *Superior Court* (1981) 119 Cal.App.3d 534, 550 [174 Cal.Rptr. 148].)

■ Here, Dr. Brennan filed a section 11166 report alleging she suspected Caplan had abused Cindy because Cindy told her Caplan had sexually molested her on a daily basis during her stay in the Caplan home. The court ruled only the report could come in evidence and that unless the People called Dr. Brennan in its case-in-chief, Caplan could not discover Dr. Brennan's notes or question her about her discussions with Cindy regarding the allegations against him. Nor did the court allow Caplan to cross-examine Cindy about the statements she made to Dr. Brennan. Caplan was thus foreclosed from fully and effectively confronting the major witness against him about the very statements making up her complaint. In limiting cross-examination, the court allowed Cindy, through the People, to invoke a privilege which she no longer held concerning her statements to Dr. Brennan. This was error of constitutional dimension. ■ " 'The main and essential purpose of the [constitutional right] of confrontation is *to secure for the opponent the opportunity of cross-examination.* . . .' " *(Davis* v. *Alaska* (1974) 415 U.S. 308, 315-316 [39 L.Ed.2d 347, 353, 94 S.Ct. 1105], quoting from 5 Wigmore on Evidence (3d ed. 1940) § 1395, p. 123, italics in Wigmore.) Cross-examination provides the jury the opportunity to fully assess the credibility of witnesses and their testimony. (See *California* v. *Green* (1970) 399 U.S. 149, 158 [26 L.Ed.2d 489, 497, 90 S.Ct. 1930]; *People* v. *Green* (1971) 3 Cal.3d 981, 989 [92 Cal.Rptr. 494, 479 P.2d 998].)

■ The judge's rulings as to the testimony of Drs. LeLievre and Susan Harradon-Trowbridge, however, were correct. Defense counsel represented to the court neither LeLievre nor Harradon-Trowbridge had any knowledge of the sexual assaults. Counsel did call Harradon-Trowbridge as a witness but was foreclosed from asking her any questions about her conversations with Cindy because the privilege was invoked for Cindy. Because neither doctor suspected Cindy was the victim of child abuse, the Evidence Code section 1027 exception does not apply to their communications with Cindy.

Turning to the discovery aspect of Caplan's request, we find instructive *People* v. *Reber* (1986) 177 Cal.App.3d 523 [223 Cal.Rptr. 139], and the recent United States Supreme Court case *Pennsylvania* v. *Ritchie* (1987) 480 U.S. 39 [94 L.Ed.2d 40, 107 S.Ct. 989]. *People* v. *Reber* holds "adher-

ence to a statutory privilege of confidentiality must give way to pretrial access when it would deprive a defendant of the constitutional right of confrontation and cross-examination." (*Id.* at p. 531.) *Ritchie* holds constitutional due process, and not the right to confrontation, compels the People to turn over evidence in its possession pretrial that is both favorable to the accused and material to guilt or punishment. Both cases set out procedures for the trial court to follow for in camera review of the sought-after material.

The trial court here did not review the records, notes or files of Dr. Brennan subpoenaed by Caplan and argued by Caplan to be necessary for the preparation and presentation of his defense. The court merely upheld Cindy's privilege not to allow any disclosures. Therefore, the court again erred.

Are these errors harmless? ■ While *People* v. *Reber* holds reversal is only warranted if a defendant demonstrates actual prejudice in being wrongfully denied pretrial discovery (*People* v. *Reber, supra,* 177 Cal.App.3d 523 at p. 532), the more stringent reasonable doubt standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065], applies to violations of a defendant's constitutional right to confrontation at the time of trial. ■ The question then becomes whether there is a reasonable possibility the complained-of erroneous evidentiary ruling might have contributed to the conviction. *(People* v. *Stritzinger, supra,* 34 Cal.3d 505 at p. 520.)

Here, the court precluded Caplan at trial from fully cross-examining Cindy and from confronting Dr. Brennan. The court did not attempt to review Dr. Brennan's records for any favorable or material statements for the defense. The case was basically a war of credibility: Cindy's versus Caplan's. While we hesitate to interfere with the trier of fact's weighing of that credibility, we do not know what the psychotherapy records would have uncovered or what Dr. Brennan or Cindy would have said on cross-examination. Thus, we cannot say whether such information would be helpful to Caplan's claim of innocence. We therefore reverse and remand for further proceedings.

Caplan is entitled to have the trial court review the erroneously excluded evidence to determine whether any of the information would have assisted Caplan's defense position during cross-examination or in its case-in-chief and whether such would have changed the outcome of his trial. If it does, he must be given a new trial. If the evidence contains no such information, or if

its exclusion was harmless beyond a reasonable doubt, the court shall reinstate the judgment of conviction.

### III

■■■ In the interest of judicial economy, and in the event the trial court finds the evidentiary errors harmless, we address Caplan's claim the court's finding of guilt for the two counts of oral copulation is unsupported by substantial evidence.

■■■ Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it. (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].) We do not reweigh the evidence; the credibility of the witnesses is a matter to be determined by the trier of fact. (Evid. Code, § 312.) ■■■ Having reviewed the whole record "in the light most favorable to the judgment below [, we determine such] discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find [Caplan] guilty beyond a reasonable doubt." *(People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

As noted by the trial court, the expert testimony concerning the physical evidence of the sexual abuse to Cindy did not apply to the oral copulation counts. Consistent with her preliminary hearing testimony, Cindy testified unequivocally at trial about the two separate oral copulation episodes. Additionally, Debbie's testimony, as well as Caplan's, corroborate the fact something happened in the hallway involving Cindy and Caplan which made Debbie angry. Debbie's repeated suspicions and comments made to Nurse Mueller and at trial she was concerned about the inappropriate attention Caplan gave Cindy further supported the possibility the events occurred. Deputy Simmons stated Cindy's story about the molestations was consistent with truth. Moreover, Caplan, while generally denying he could commit such crimes, never specifically denied the acts of oral copulation. The record reflects the court fully considered the credibility of all the witnesses before making its decision. Sufficient evidence supports that decision.

### IV

The judgment is reversed and remanded for further proceedings consistent with this opinion. ■■■■■ If the judgment is reinstated, the

court is instructed to amend the abstract of judgment to reflect the correct sentence.[6]

Work, Acting P. J., and Todd, J., concurred.

A petition for a rehearing was denied July 24, 1987.

---

[6] The sentencing transcript shows the court imposed a lower term on one lewd and lascivious conduct count and then stated: "The court will run the one-third the mid term additional sentence of one year concurrently. . . . [¶] Should the sentence on the primary term be set aside for any reason, this court would indicate that it would increase the sentence on count two to three years of mitigated term which should be served." While the end result is the same, the sentence as stated is unauthorized. A "one-third the mid term" is only authorized when a sentence on a subsequent count is imposed to run consecutive to the first count and is justified by appropriate reasons. (§ 1170.1) Here, the record is clear the court did not intend to run the sentences consecutively. The abstract of judgment should reflect the three-year lower term on count one and the three-year lower term on count two to run concurrent with count one.