[No. H013720. Sixth Dist. May 31, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
DON DANCER, Defendant and Appellant.

1678

**COUNSEL**

Alan S. Yockelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Catherine A. Rivlan and Doug MacMaster, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WUNDERLICH, J.—**

## I. *Statement of the Case*

Defendant Don Dancer appeals from a judgment entered after a jury found him guilty of five counts of lewd and lascivious conduct upon a child and one count of attempted lewd conduct and the court found that he suffered a prior conviction for forced oral copulation on a minor. He claims he was denied his right to the assistance of conflict-free counsel. He claims the court erred in admitting evidence concerning the circumstances of his prior felony conviction and in failing to release the victim's psychological records. Finally, he claims the court erred in imposing an aggravated sentence. We affirm the judgment.

## II. *Facts*

In January 1993, Janet H. (hereafter, mother) and her four-year-old daughter Emily moved into an apartment complex in Campbell. Mother soon met defendant, a friendly, elderly man, who lived downstairs in the same complex. Defendant specially befriended Emily, giving her candy and ice cream, which they would eat on his front porch. They played together in the courtyard of the complex. Emily would also go to an exercise room in defendant's garage, where she played on his equipment and a mattress he kept there. Emily grew to like defendant.

In February 1993, mother learned that defendant had invited Emily into his apartment for a treat. She told him not to do so again. She made it clear she was upset, and defendant calmly accepted her directive.

In August 1993, mother found Emily and defendant alone inside his garage. The curtains were drawn, and Emily was on an exercycle. Alarmed, mother collected Emily and told her she was no longer allowed to play with defendant. Thereafter, mother never saw Emily playing with defendant. However, Emily continued to do so.

In December 1993, Emily told her mother she no longer wanted to play with defendant because he asked her to play a "yucky" game that involved touching the "area covered by [her] swimming suit." Mother called child protective services and later spoke to the police.

Officer Russell Patterson of the Campbell Police Department interviewed Emily. She was shy and clung to her mother and was reluctant to discuss the

molestation. She said that during the summer, defendant told her to pull down her pants and she did. She said they touched each other's private parts in the garage. She said he put his finger inside her body and it hurt.

At trial, Emily testified that she would play in defendant's exercise room and with his equipment. One day, he pulled down his pants, opened his underwear, and exposed his penis to her. She touched and manipulated it. They engaged in the same activity a few days later. On another occasion, defendant asked her to suck his penis, but she declined because she "thought it tasted yucky or something." Emily also said that on more than one occasion, defendant told her to pull down her pants, and he touched and penetrated her vagina. She said it hurt a little the first time and more the second time. Emily said this scared her.[1] She said the molestation occurred between the summer and her entry into kindergarten. She did not report these incidents to her mother immediately because she was afraid she would get in trouble and would be punished for disobeying her mother.

The prosecutor also presented evidence concerning defendant's 1982 conviction. Christine H. testified that in June 1982, defendant began living with her, her husband, and her two daughters, Serene aged two and Tuolumne aged thirteen months. During his three months there, defendant played with the girls and would babysit them.

One evening, Christine and her husband went out and left defendant to babysit. They returned early and found defendant on the mattress in their bedroom with Tuolumne. His pants were unzipped, his penis was exposed, and it seemed he was putting it in her mouth. Christine shouted at him and ran out. When she reentered to confront him, he was gathering his things and calmly told her he did not know what was happening but thought it better to leave.

### III. *Assistance of Conflict-free Counsel*

 Defendant contends he was denied his right to conflict-free counsel when the court permitted Deputy Public Defender Yolanda Trevino to continue representing him after she declared a conflict of interest. We disagree.

---

[1]Officer Jeffrey Miller of the Los Gatos Police Department testified as an expert on "child sexual abuse accommodation syndrome." He explained that the syndrome is a diagnostic tool and not a means to determine whether a child has, in fact, been molested. He noted that the syndrome has five components: secrecy; helplessness; entrapment and accommodation; delayed, conflicted, and unconvincing disclosure; and retraction. However, not all components will necessarily manifest themselves in a given case. Miller was unfamiliar with the facts of this case and, therefore, did not offer an opinion about whether Emily's conduct reflected elements of the syndrome.

Several months before trial, Trevino declared a conflict of interest limited to a single issue: the validity of defendant's 1982 prior conviction. After an unreported conference in chambers, the court noted on the record that the validity of the prior was an important issue and then appointed conflicts attorney Brenda Malloy to investigate whether to challenge the validity of the prior conviction. Malloy ultimately filed a motion to strike, alleging that defendant's guilty plea was not knowing or voluntary and that there was no factual basis for the plea. After a hearing, the court denied the motion, relieved the conflicts attorney, and permitted Trevino to continue. Defendant did not object to the procedure or at any time seek to have Trevino replaced as his attorney.

■ The state and federal Constitutions guarantee defendants effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) This guarantee includes the correlative right to representation free of conflicts of interest. (*People* v. *Bonin* (1989) 47 Cal.3d 808, 833 [254 Cal.Rptr. 298, 765 P.2d 460].)

Under the Sixth Amendment of the federal Constitution, reversal is required if a defendant, over a timely objection, is forced to continue with conflicted counsel. In the absence of an objection, however, a defendant on appeal must demonstrate that an *actual* conflict of interest adversely affected counsel's performance. The mere possibility of a conflict is not sufficient to compel reversal of a conviction. (*Cuyler* v. *Sullivan* (1980) 446 U.S. 335, 348 [64 L.Ed.2d 333, 346-347, 100 S.Ct. 1708]; *Holloway* v. *Arkansas* (1978) 435 U.S. 475, 488 [55 L.Ed.2d 426, 436-437, 98 S.Ct. 1173]; *People* v. *Easley* (1988) 46 Cal.3d 712, 724 [250 Cal.Rptr. 855, 759 P.2d 490].)

Our state Constitution imposes "a somewhat more rigorous standard." (*People* v. *Mroczko* (1983) 35 Cal.3d 86, 104 [197 Cal.Rptr. 52, 672 P.2d 835].) Proof of an *actual* conflict is never required. (*People* v. *Cox* (1991) 53 Cal.3d 618, 654 [280 Cal.Rptr. 692, 809 P.2d 351].) Even in the absence of an objection, a potential conflict may require reversal if the " 'record supports "an informed speculation" ' " that the defendant's right to effective representation was, in fact, prejudicially affected. (*Ibid.*) However, under such circumstances, there must be some "discernible" grounds to believe that prejudice occurred. (*People* v. *Rodriguez* (1986) 42 Cal.3d 1005, 1014 [232 Cal.Rptr. 132, 728 P.2d 202].) In other words, the " 'existence of even a potential conflict of interest must be accompanied by some evidence of ineffective representation before reversal is required.' " (*People* v. *Clark* (1993) 5 Cal.4th 950, 995 [22 Cal.Rptr.2d 689, 857 P.2d 1099], quoting *People* v. *Marshall* (1987) 196 Cal.App.3d 1253, 1257-1258 [242 Cal.Rptr. 319].)

 Here, although Trevino declared a conflict, she did not explain what it was. Nor did the court investigate on the record the basis for the declared conflict. Consequently, we are unable to determine its nature.[2] Presumably, it concerned the fact that a public defender had represented defendant when he pleaded guilty in 1982. This fact alone does not necessarily create an actual conflict. (See *People* v. *Daniels* (1991) 52 Cal.3d 815, 843 [277 Cal.Rptr. 122, 802 P.2d 906].) Nevertheless, assuming a conflict, we agree with Trevino's assessment, implicitly adopted by the court, that the conflict conceivably could have compromised her ability to challenge the validity of defendant's prior conviction. Since such a challenge might implicate the performance of defendant's former public defender, Trevino could experience conflicting loyalties, i.e., to her office and fellow public defenders and to defendant.

However, we also agree with Trevino's view that the conflict was limited to the one issue and could not have interfered with any other decision reasonably necessary to provide constitutionally adequate representation. This is so because the only other issues related to defendant's prior conviction involved the prosecutor's use of the prior and underlying facts at trial. However, opposing such use in no way implicates the performance of former counsel and, therefore, could not pose a situation in which Trevino might feel divided loyalty.[3] In fact, a ruling on the validity of the prior would eliminate Trevino's professed conflict.

Defendant now argues that there is no such thing as a limited conflict. A conflict is a conflict, and once it was declared, it completely disqualified Trevino unless defendant waived it, which he did not do.

 As outlined above, the touchstone for analyzing a conflict and a trial court's response thereto is defendant's right to effective, conflict-free representation. Obviously, some conflicts are so basic and implicate so many of the duties and decisions of defense counsel that they completely undermine counsel's ability to provide effective representation. (See examples of conflicts noted in *People* v. *Bonin, supra,* 47 Cal.3d at pp. 835-836; *In re Darr* (1983) 143 Cal.App.3d 500, 509 [191 Cal.Rptr. 882].) Under such circumstances, the only practical means to protect a defendant's right, other than obtaining a waiver, is to provide for a new attorney.

However, we reject defendant's rigid view that all conflicts are disabling and that the Constitution invariably requires a change of counsel whenever

---

[2] A conflict involves any situation " 'in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his [or her] responsibilities to another client or a third person or by his [or her] own interests.' " (*People* v. *Clark, supra,* 5 Cal.4th at p. 994.)

[3] In fact, the validity of the prior and the admission of facts concerning the underlying offense are so unrelated that those facts could be admitted even if the prior conviction were deemed invalid. (See *People* v. *Daniels, supra,* 52 Cal.3d at pp. 842-843, fn. 2.)

any sort of conflict is declared. As illustrated by this case, there are conflicts whose potential impact is extremely focused and limited and there are alternative remedies short of replacing counsel that can fully protect a defendant's constitutional right. In particular, where, as here, the conflict could only affect the counsel's representation on a discrete, preliminary matter, we believe a court may, and here properly did, appoint separate counsel for the limited purpose of litigating it. As discussed above, this remedy fully guaranteed defendant's right to conflict-free counsel: it not only prevented the conflict from having any effect, it eliminated the conflict altogether. Furthermore, it provided the added benefit of preserving the preexisting attorney-client relationship between Trevino and defendant, about which defendant had never expressed dissatisfaction or even concern. Although we are not aware of any authority that supports the remedy fashioned by the court below, we are also not aware of any authority prohibiting it.[4]

In any event, defendant did not object to the procedure employed by the court for dealing with Trevino's conflict. Thus, under both federal and state law, he must still show that it had a demonstrable and negative effect on his right to effective representation. (*People* v. *Marshall, supra,* 196 Cal.App.3d at pp. 1257-1258.) This he cannot do.

Defendant claims that because of the conflict, Trevino " 'pulled her punches' " in opposing the prosecutor's motion to use the prior and underlying factual circumstances at trial. In particular, he notes that the People filed a 10-page written motion with 48 pages of exhibits in support of a motion to admit the facts of the prior offense. He points out, however, that "defense counsel offered no written response" and argues that she "was in a very poor position to even argue the factual basis for the prior conviction since her office had advised [defendant] to plead guilty, yet no factual basis for the plea was shown on the record."

---

[4]We note that in *People* v. *Makabali* (1993) 14 Cal.App.4th 847 [18 Cal.Rptr.2d 72], the trial court appointed new counsel to investigate whether to present a motion to withdraw a plea based on incompetence of *trial counsel.* New counsel did so and decided there was no basis for a motion. Original counsel then continued representing defendant. (*Id.* at p. 850, 852-853.) In *People* v. *Smith* (1993) 6 Cal.4th 684 [25 Cal.Rptr.2d 122, 863 P.2d 192], the court in dicta discussed *Makabali* and observed, "We are unaware of any authority supporting the appointment of simultaneous and independent, but potentially rival, attorneys to represent defendant. When a *Marsden* motion is granted, new counsel is substituted for all purposes in place of the original attorney, who is then relieved of further representation." (*Id.* at p. 695.)

The circumstances here are materially distinguishable from *Makabali.* Defendant made no *Marsden* motion. (*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 456 P.2d 44].) Defendant expressed no dissatisfaction with or a lack of confidence in Trevino. And Trevino and Malloy were not potential rivals because Malloy was not being asked to evaluate the performance of Trevino. Consequently, the dicta in *Smith* does not suggest that the practical remedy fashioned by the court in this case was inappropriate or improper.

The record refutes defendant's claim. (See, e.g., *People* v. *Castillo* (1991) 233 Cal.App.3d 36, 62-63 [284 Cal.Rptr. 382].) The prosecutor's moving papers were filed on the day his motion was to be heard.[5] Thus, Trevino's failure to file a *written* response fails to imply conflict-induced restraint. Moreover, at the hearing on the motion, Trevino thoroughly opposed the motion with vigor and intelligence. Moreover, at trial, Trevino carefully cross-examined Christine H. about the prior conviction and sought to distinguish it from the instant offenses. During closing argument, Trevino emphasized the distinction and argued that they did not reveal a common plan or scheme pursuant to which defendant committed the offense against Emily. Finally, on appeal, defendant does not suggest what more Trevino could or should have done to oppose the prosecutor's motion and use of the evidence at trial.

The meaning of defendant's comment that because of the conflict Trevino "was in a very poor position to even argue the factual basis for the prior conviction" is unclear. Moreover, we agree with the People that given the testimony concerning the prior offense and the undeniable fact that he suffered a prior conviction, it would have been unreasonable for Trevino to argue to the jury that defendant did not commit the offense to which he pleaded guilty. Instead, she "pursued the only tactically feasible goal, i.e., she sought to distinguish the 1982 facts from the 1993 facts . . . ." In our view, defendant leaps from Trevino's declared conflict to a factually unsupported claim that he received less than effective representation.

## IV. *Evidence of Prior Molestation*

■ Defendant contends the trial court erred in admitting the circumstances of his prior offense as evidence to show a common design or plan. He claims this incident was too dissimilar to the instant offense and too inflammatory to be admitted. We disagree.

Evidence of other, currently uncharged, offenses or misconduct is inadmissible to prove a criminal disposition. (Evid. Code, § 1101, subd. (a).) However, it is admissible if it has a tendency to prove, establish, among other things, identity or a common design or plan or intent. (Evid. Code, § 1101, subd. (b).) Here, the main issue was whether the acts described by Emily occurred.

■ " 'The presence of a design or plan to do or not to do a given act has probative value to show that the act was in fact done or not done.' [Citation.]" (*People* v. *Ewoldt* (1994) 7 Cal.4th 380, 393 [27 Cal.Rptr.2d 646, 867

[5]The exhibits submitted by the prosecutor included police reports and copies of two California Supreme Court cases.

P.2d 757].) "[I]n establishing a common design or plan, evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.'" (*Id.* at p. 402.) Moreover, "the common features must indicate the existence of a plan rather than a series of similar, spontaneous acts, but the plan thus revealed need not be distinctive or unusual. . . . [I]t need only exist to support the inference that the defendant employed that plan in committing the charged offense." (*Id.* at p. 403.)

For example, in *People* v. *Balcom* (1994) 7 Cal.4th 414 [27 Cal.Rptr.2d 666, 867 P.2d 777], the defendant went to an apartment complex at 1 a.m. He was wearing a cap. He knocked at an apartment, and when the single female occupant opened a patio area to see who it was, the defendant jumped a fence, pointed a rifle at her, and ordered her back inside. There, he immediately demanded money, her "ATM" card and "PIN" number, jewelry, and the keys to her car. He fondled her while she responded. He then demanded more, and when she failed to do so, he said he would have to rape her. He then tied her up, removed her clothes, raped her, and thereafter left with her property and car. (*Id.* at p. 419.)

At trial, evidence of a rape that occurred six weeks earlier was admitted. In that incident, a single woman was in her car driving out of the parking area of her apartment complex. The defendant, who was wearing a cap, stopped her for directions, and then put a gun to her head, opened the door, and entered. He said he only wanted money, but when she looked for it, he jumped on top of her, removed her clothes, and raped her. Thereafter, he took her "ATM" card, demanded the "PIN" number, and left in her car. (*People* v. *Balcom, supra,* 7 Cal.4th at p. 421.)

Although there were marked dissimilarities between the two incidents, our Supreme Court found that they nevertheless shared sufficient common features to support an inference that both were manifestations of a common design. (*People* v. *Balcom, supra,* 7 Cal.4th at p. 424.) In particular, the court noted that the incidents occurred six weeks apart and in both the assailant wore a cap, went to an apartment complex early in the morning, selected a lone female unknown to him, gained control at gunpoint, initially demanded only money, forcibly removed clothing, committed a single act of intercourse, stole an "ATM" card and obtained the "PIN" number, and left in the victim's car. (*Ibid.*)

 In this case, the incidents share numerous common features. Defendant resided near the victims and was acquainted with their parents.

He selected very young girls as victims; he had a history of unsupervised access to the victims and played or babysat with them. The victims knew and trusted him. In committing the molestations, he selected locations out of public view, where mattresses were located. He exposed his penis through his clothing, the victims had contact with it, and he tried to have both orally copulate him. Finally, when confronted by Janet about being alone with Emily and by Christine about molesting Tuolumne, defendant responded calmly.

In our view, these common features reasonably support an inference that each incident was a manifestation of a common design or plan rather than two unrelated spontaneous acts. Indeed, the inference, in our view, is strong.

We reject defendant's claim that because the distinctions between the two incidents render their similarities more apparent than real, the evidence was inadmissible. For example, he notes specific differences between the victims' ages, his place of residence, his relationship with the victims' parents, his access to the victims, the rooms in which the mattresses were located, and the circumstances in which he responded calmly. However, these specific differences, like those in *Balcom*, do not negate the basic similarity between the two incidents or render unreasonable the inference therefrom that defendant acted according to a common design or plan. Rather, these differences affect the strength of the inference.

In short, the trial court properly found that the prior incident was sufficiently similar to be admissible to prove a common design or plan. Such a finding, however, does not mean that admitting the evidence was proper. ■ "Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' " (*People* v. *Ewoldt, supra,* 7 Cal.4th at p. 404.) Thus, before admitting it, a court must be satisfied that its probative value outweighs any prejudicial effect. (*Ibid.*; see Evid. Code, § 352.)

In *People* v. *Ewoldt, supra,* 7 Cal.4th at pages 404-405, the court identified various relevant factors: (1) whether the inference of a common design or plan is strong; (2) whether the source of evidence concerning the present offense is independent of and unaffected by information about the uncharged offense; (3) whether the defendant was punished for the prior misconduct; (4) whether the uncharged offense is more inflammatory than the charged offense; and (5) whether the two incidents occurred close in time.

■ As noted above, the evidence showing a common design or plan was strong. The evidence of both incidents came from independent sources.

The jury learned that defendant had been convicted for the prior misconduct, eliminating any incentive to punish him for that conduct regardless of his guilt for the present offense. Evidence concerning the prior incident was not markedly more inflammatory than evidence of the current charge. Although the prior incident involved a toddler, Emily was also very young, his conduct with her was far more extensive, he digitally penetrated her, and he hurt her. Finally, although the remoteness of the prior incident from the current one, 11 years, tends to degrade its probative value, it does not, by itself, warrant or compel its exclusion.

On balance, we believe the trial court could reasonably conclude that the probative value of the prior incident outweighed any prejudicial effect. Thus, we do not find that the court abused its discretion in admitting the evidence.

## V. *Discovery of Psychological Records*

Defendant contends the trial court erred in refusing to provide him with the psychological records of two therapists who saw Emily.[6] We disagree.

The records sought were protected from discovery by the psychotherapist-patient privilege. (Evid. Code, § 1014.) This privilege, however, is not absolute and in appropriate cases must yield to a criminal defendant's right to a fair trial. (*People* v. *Boyette* (1988) 201 Cal.App.3d 1527, 1532 [247 Cal.Rptr. 795]; *People* v. *Caplan* (1987) 193 Cal.App.3d 543, 555 [238 Cal.Rptr. 478].)

In *People* v. *Reber* (1986) 177 Cal.App.3d 523 [223 Cal.Rptr. 139], the court opined that in determining whether to release privileged psychiatric records, the trial court should (1) obtain the records and review them in camera; (2) weigh the constitutional right to cross examination against the statutory privilege; (3) determine which if any of the privileged material is essential to vindicate the defendant's constitutional right; and (4) create an adequate record for review. (*Id.* at p. 532.)

However, to obtain a *Reber* review, a defendant must establish "good cause" for doing so, which in this context means the defendant must describe the records sought "with reasonable specificity" and provide a "plausible justification" for producing them. (*Lemelle* v. *Superior Court* (1978) 77 Cal.App.3d 148, 162 [143 Cal.Rptr. 450].)

---

[6]Prior to trial, defendant subpoenaed the psychological records of psychotherapists Barbara Wyman and Linda Henry concerning Emily. Both therapists asserted the psychotherapist-patient privilege against disclosure. (Evid. Code, § 1014.)

With these principles in mind, we turn to the facts of this case. On appeal, defendant explains that he sought the documents because "they might contain information relevant to Emily['s] credibility as a witness, as well as shedding light on a 'rage condition' that Emily had apparently been suffering with for several months prior to accusing [defendant] of molestation."[7]

Putting the cart before the horse, the trial court reviewed the psychological records to determine whether defendant had made a sufficient "initial showing," in effect rendering a showing of "good cause" unnecessary. The court then found that defendant failed to do so.[8] The court further found that despite defendant's failure to make an "initial showing," the records contained nothing relevant or likely to lead to relevant evidence and, therefore, nothing to balance against the right to a fair trial and to confront the witnesses against him. Consequently, it denied the request for discovery.

The People claim the trial court correctly found that defendant's "initial showing" of good cause was insufficient to warrant a *Reber* review. However, the propriety of this finding is essentially moot because the court did in fact review the records. Thus, we proceed to the ultimate issue of whether the trial court's decision after review was proper.

The psychological records are before us, and both parties request that we review them. Defendant asks us only to determine whether their release is required now to help him better argue his claim on appeal. The People ask us to directly review the court's ruling.

The People's approach is more sensible and efficient. We are fully capable without further briefing of determining whether discovery should have been allowed. Having reviewed the psychological records, we concur with the trial court's ultimate conclusion. They contain no information whose release was potentially essential to vindicate defendant's right to a fair trial and to confront Emily. (*People* v. *Reber, supra,* 177 Cal.App.3d at p. 532.) Thus, we concur with the trial court's implicit finding that defendant's rights did not outweigh the victim's right to privacy as reflected by the privilege protecting the confidentiality of her psychologists' records.

Moreover, we can say with confidence that even if we assume, for purposes of argument, that the scales did tip in favor of defendant's right to

---

[7]The transcript of the hearing below indicates that defendant submitted moving papers to the court at the time of the hearing. However, those papers are not part of the record on appeal.

[8]We do not approve of this procedure because an in camera review is itself a breach of the privilege and an invasion of privacy. (See *People* v. *Pack* (1988) 201 Cal.App.3d 679, 686 [248 Cal.Rptr. 240].)

discovery, the failure to release the records was harmless beyond a reasonable doubt because the records did not contain relevant and material information, that is, "information that probably would have changed the outcome . . . ." (*Pennsylvania* v. *Ritchie* (1987) 480 U.S. 39, 58 [94 L.Ed.2d 40, 58, 107 S.Ct. 989]; see *People* v. *Boyette*, *supra*, 201 Cal.App.3d at pp. 1538-1539.)

## VI. *Aggravated Sentence*

■ Defendant contends the trial court abused its discretion in selecting the aggravated term for one count and imposing consecutive sentences on three other counts. He claims the court based these sentencing choices on invalid reasons.

The court imposed the aggravated sentence because Emily was "particularly vulnerable" due to her young age. (See Cal. Rules of Court, rule 421(a)(3).) The court also cited the fact that "the manner in which the crime was carried out indicates some planning, sophistication or professionalism evidenced by its repetition." (Cal. Rules of Court, rule 421(a)(8).) Finally, the court opined, "I am not convinced that these events all occurred on the same day and I think they occurred over a period of time which goes back to the violation of a position of trust that I was making [*sic*] earlier."[9] (See Cal. Rules of Court, rule 421(a)(11).)

Defendant challenges the validity of all of these reasons. He first claims "particular vulnerability" due to Emily's age is not a proper reason because her age was an element of the offense.

Defendant did not object below to the trial court's reliance on Emily's "particular vulnerability." Thus, he waived any challenge to it on appeal. (*People* v. *Scott* (1994) 9 Cal.4th 331, 348 [36 Cal.Rptr.2d 627, 885 P.2d 1040] ["[D]efects in the trial court's statement of reasons are waived unless challenged at the time of sentencing."].)[10]

In any event, we would reject this claim. Defendant is correct that aggravating a sentence due to "particular vulnerability," where vulnerability

---

[9]In denying probation, the court rejected defendant's claim that he did not occupy a position of trust vis-à-vis Emily. "I understand your position that there was no official position of trust here, but it occurs to me that when a young child who is four or five years old is playing in a neighbor's residence or garage on a repeated basis, that a relationship develops, a position of—somewhat of a position of trust. It's not like a babysitter or parent or someone entrusted with the safety of the child. [¶] On the other hand, [defendant] definitely had some sort of relationship with Emily. She would come down and play down there, I guess because there weren't other kids to play with her age. So there was a breach of faith there with regard to that relationship such as it was."

[10]Defendant suggests defense counsel ought not be held responsible for "intracacies" of *Scott* because it was decided only six weeks before sentencing. We disagree. The rule

is based *solely* on age, is improper when age is an element of the offense. (See *People* v. *Ginese* (1981) 121 Cal.App.3d 468, 477 [175 Cal.Rptr. 383]; *People* v. *Flores* (1981) 115 Cal.App.3d 924, 927 [171 Cal.Rptr. 777].) However, "particular vulnerability" is determined in light of the "total milieu in which the commission of the crime occurred . . . ." (*People* v. *Price* (1984) 151 Cal.App.3d 803, 814 [199 Cal.Rptr. 99].) Defendant acknowledges that a victim's extremely young age together with other circumstances like the time and location of the offense can establish "particular vulnerability" as an aggravating factor.

Here, Emily was between four and five years old at the time of the offense. Her brother was living elsewhere with her father, and a neighbor boy had moved away. Thus, as the court noted, she had no playmates her age. The record also reveals that the molestation took place in defendant's garage, outside of public view, and Emily had played there before, making her unaware of any potential danger there. On the other hand, she had been specifically told by her mother not to go there and later was afraid to reveal the molestation, fearing punishment for her disobedience.

In our view, Emily's lack of playmates, the location of the molestation, Emily's playful experiences there, her fear about being punished for being there, and her extreme youth reasonably support a finding that she was "particularly vulnerable." (Cf. *People* v. *Valdez* (1994) 23 Cal.App.4th 46, 49 [28 Cal.Rptr.2d 236]; *People* v. *Estrada* (1986) 176 Cal.App.3d 410, 418-419 [221 Cal.Rptr. 922]; *People* v. *Garcia* (1985) 166 Cal.App.3d 1056, 1070 [212 Cal.Rptr. 822].)

■ Defendant next argues that the record does not support a finding that he took advantage of a position of trust or confidence to commit the offense. He notes that he was not a parent, relative, quasi-parent, volunteer or authorized babysitter, religious figure, or day-care provider. Moreover, mother did not trust defendant to be alone with Emily.

As defendant acknowledges, this potential aggravating factor focuses on his " 'special status' " vis-à-vis Emily. (*People* v. *Franklin* (1994) 25 Cal.App.4th 328, 338 [30 Cal.Rptr.2d 376].) Defendant disregards the fact

propounded in *Scott* is not "intricate" and merely mirrors the general rule that the failure to object to alleged errors at trial, and thereby give the court an opportunity to correct them, constitutes a waiver of the errors on appeal. (*People* v. *Scott, supra,* 9 Cal.4th at p. 354; *People* v. *Clark* (1990) 50 Cal.3d 583, 618 [268 Cal.Rptr. 399, 789 P.2d 127]; see, e.g., Evid. Code, § 353.) We believe six weeks is more than enough time for competent criminal defense counsel to understand the simple rule it propounded. This is especially so given the court's previous decision in *People* v. *Welch* (1993) 5 Cal.4th 228 [19 Cal.Rptr.2d 520, 851 P.2d 802] [failure to object waives challenge on appeal to conditions of probation].)

that he, an elderly man, intentionally ingratiated himself to a very young child, who had no resident father, brother, or playmates. He played with her, gave her things to eat, let her use his exercise equipment, and fostered a relationship in which Emily trusted and had confidence in him, so much so that she would defy her mother's warning not to go into defendant's garage.

These circumstances support the trial court's finding that defendant committed his offenses by exploiting the trust and confidence he had cultivated. (Cf. *People* v. *Robinson* (1992) 11 Cal.App.4th 609, 615 [14 Cal.Rptr.2d 88].)

■ Finally, defendant challenges the court's reliance on the manner and sophistication of the offense as "evidenced by its repetition." He argues that if by repetition, the court was referring to his prior conviction, then the court improperly relied on his prior to enhance and aggravate the term for count one. (See Cal. Rules of Court, rule 420(c); *People* v. *Bowen* (1992) 11 Cal.App.4th 102, 104-105 [14 Cal.Rptr.2d 40].) He further argues that the subsequent repetition of lewd acts does not render the first act worse.

Again, defendant failed to object to the aggravated term on this ground and therefore waived any error. (*People* v. *Scott*, *supra*, 9 Cal.4th at p. 348.)

In any event, defendant misses the point of the trial court's reason: that the offense was planned and sophisticated, rather than a single spontaneous instance of aberrant behavior. As noted above, defendant cultivated a trusting relationship with Emily, played with her, got her used to playing in his garage, and then took advantage of her. Moreover, he did this on more than one occasion. Thus, the circumstances leading to the first offense plus its repetition thereafter indicate planning and sophistication, thereby making it worse than a sudden spontaneous act. (Cf. *People* v. *Jones* (1992) 10 Cal.App.4th 1566, 1577 [14 Cal.Rptr.2d 9].)

In sum, the record fully supports all three of the trial court's reasons for imposing the aggravated term. Moreover, as defendant acknowledges, a single appropriate factor is sufficient to support an aggravated term. (*People* v. *Forster* (1994) 29 Cal.App.4th 1746, 1758-1759 [35 Cal.Rptr.2d 705].) Thus, errors, if any, by the court in articulating these reasons are harmless and a remand for resentencing would serve no purpose.[11] (*People* v. *Garcia*, *supra*, 166 Cal.App.3d at p. 1070.)

---

[11]For this reason, defendant could not prevail on a claim that counsel was ineffective in failing to make specific objections to some of the court's sentencing reasons. Simply put, defendant cannot establish that he would have received a more favorable sentence had counsel made the particular objections. (*In re Clark* (1993) 5 Cal.4th 750, 766 [21 Cal.Rptr.2d 509,

Since the court relied on the violation of a position of trust in imposing consecutive sentences, defendant's challenge to those sentences fails for the same reasons discussed above. As noted above, a single valid factor is sufficient to justify a sentencing choice. (*People* v. *Williams* (1991) 228 Cal.App.3d 146, 153 [278 Cal.Rptr. 801].) Moreover, the same factor can support numerous consecutive sentences and a single proper statement of reasons will support them. (*People* v. *Robinson, supra,* 11 Cal.App.4th at p. 616; *People* v. *Williams* (1984) 157 Cal.App.3d 145, 156 [203 Cal.Rptr. 562].)

*Disposition*

The judgment is affirmed.

Premo, Acting P. J., and Elia, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 18, 1996.

---

855 P.2d 729]; *People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1057-1058 [5 Cal.Rptr.2d 230, 824 P.2d 1277]; see *Strickland* v. *Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 693-694, 104 S.Ct. 2052].)