Filed 10/2/13  P. v. Alvisar CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DANIEL NAVARRO ALVISAR,<br><br>    Defendant and Appellant. | F064413<br><br>(Super. Ct. No. VCF225514)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Darryl B. Ferguson, Judge.

Sylvia Whatley Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Alice Su, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Daniel Navarro Alvisar was charged by information with murder involving the personal use and intentional discharge of a firearm, proximately causing death (Pen. Code,[1] §§ 187, subd. (a), 12022.5, subd. (a), 12022.53, subds. (b)-(d); count 1) and child abuse involving the personal use of a firearm (§§ 273a, subd. (a), 12022.5, subd. (a); count 2). A jury acquitted him of murder, convicted him on count 1 of involuntary manslaughter (§ 192, subd. (b)), convicted him as charged on count 2, and found the firearm use allegation true as to that count.[2] Sentenced to an aggregate term of 17 years in prison and ordered to pay restitution and various fees, fines, and assessments, he now appeals. We affirm, but order a minor correction to the abstract of judgment.

## FACTS

## I

### PROSECUTION EVIDENCE

At approximately 10:50 p.m. on August 8, 2009,[3] Cynthia Martinez was in her home in the 1200 block of West Wren, Visalia, when she heard a single "pop" that she thought was a firecracker. She went outside, then heard a crash like something falling over. The noise came from the house across the street and one house over from Martinez's residence. Martinez heard a woman's voice say, "Oh, my God. What have you done?" After that, the voice said, "Oh, my God. Oh, my God. Oh, my God." Later, the woman said, "But I love you," then, "Oh, my God." Martinez had not heard any yelling before the pop, and in fact had never heard yelling from the direction of that house.

---

[1] All statutory references are to the Penal Code.

[2] The section 12022.5, subdivision (a) allegation was dismissed, with respect to count 1, on the People's motion prior to trial. Jurors were not asked to make a finding of firearm use with respect to involuntary manslaughter.

[3] Unspecified references to dates in the statement of facts are to the year 2009.

2.

Cynthia Adzhayan, who lived next door to Martinez, heard a loud popping that sounded like a gunshot. She saw lights flickering off and on at defendant's house. She went outside and heard a woman screaming, "Oh, my God. What have you done?" The woman continued to scream, "Oh, my God. What have you done? I love you. Why did you do this?" Adzhayan then heard defendant screaming he was sorry, and she also heard a baby screaming. During this time, she could see a dark shirt bend down, get back up, and the light in the bedroom turn off and on. This happened several times.

Martinez called the police. She and Adzhayan saw defendant quickly leave the house with his 15-month-old daughter, Danielle. Defendant put Danielle in his silver-colored car, then drove off.

Visalia Police Detective O'Rafferty and his partner, Officer Gilson, were dispatched to defendant's house at approximately 10:55 that evening, in response to a call of possible shots fired. The lights were off at the house, and they received no answer when they knocked on the front door. The door was unlocked, however, so they went inside. There were bloody footprints all over the entryway and into the hallway. Farm Chow Saefong lay on the floor in one of the bedrooms with what appeared to be fatal head trauma. There was a great deal of blood all over her and blood spatter on the wall nearby. There were also foot tracks from her to the front door. No one else was in the house.

Shortly before 11:00 that evening, Rico Guajardo and his wife and children were southbound, waiting for a red light at the intersection of Demaree and Goshen in Visalia, when a silver Toyota entered the intersection, going westbound on Goshen. The car, which was going around 40 to 50 miles per hour, attempted to turn left onto Demaree, but hit a brick sign in the corner of some offices. The car tried to back out, but would not move. Guajardo and another driver stopped. Defendant exited the vehicle and handed a child over to Guajardo's wife. Defendant seemed jittery and "amped up." He kept telling Guajardo not to worry about him, but just to go to his house and check on his wife.

3.

He gave the address. Defendant was pacing back and forth, grabbing his hair and saying he could not believe this. He said he "fucked up." He also said he could not look at his daughter because she reminded him so much of his wife, that he did not mean for it to happen, and that there should not have been a gun in the home but he needed it for protection because "they" were after him. He kept begging Guajardo to go check on his wife.

Visalia Police Officer Kuykendall, who had heard the "shots fired" call, was dispatched to the accident scene. Kuykendall found a small silver car in the decorative planter box at the southwest corner of the intersection. Danielle appeared to be uninjured, but she had a substantial amount of dried blood spatter on her. Defendant was pacing back and forth. He was crying and appeared to be very distraught. He was screaming, "How is she? How is she?" When Kuykendall asked who he meant, defendant responded, "My wife. Is she all right?" Kuykendall asked where his wife was, and defendant responded with the address on Wren Street about which Kuykendall already had information. Defendant had bloodstains on his clothing. There was blood on and in the car and on a cell phone under the driver's seat. The front of the cell phone was damaged. Kuykendall detained defendant, who had problems walking.

Kuykendall subsequently transported defendant to the Tulare County Main Jail. Defendant remained extremely distraught and emotional during the time Kuykendall was attempting to obtain booking information, although at one point when Kuykendall stepped out of the interview room to speak to someone, defendant stopped crying and appeared to try to listen to the conversation, only to start crying again when Kuykendall returned.[4]

Meanwhile, defendant's house was searched. The body was in the northeast bedroom, which also contained a bloodstained ironing board with an iron on top. There

---

[4]    Defendant was videotaped while in the interview room.

were a lot of blood stains around the body, as well as a baby's bottle and some bloodstained weights and chairs. A bullet hole went through the sliding closet doors and into the back of the closet. A bullet fragment was on the closet floor. A Heckler & Koch (H&K) semiautomatic nine-millimeter pistol was next to the bedroom door. A spent casing was jammed inside the firearm, which did not have any other bullets or any type of magazine in it. An ammunition magazine containing seven live rounds was found on the bedroom floor. A plastic gun box that bore the pistol's serial number and contained some live rounds was in the room. A bloodstained green ammunition box that was slightly open was found under the iron. In addition to bullets, the box contained a range safety checklist and ear plugs. An empty case for a rifle or shotgun was next to the closet. Two unloaded rifles and a box of 12-gauge shotgun shells were in the closet.

A handgun holster containing an ammunition magazine was found on the closet shelf in the southwest (master) bedroom. Two live .38-caliber rounds were with the holster, and the magazine itself contained a live nine-millimeter round. Also in that closet were a loaded 12-gauge shotgun and a case containing a .223-caliber rifle. The rifle was not loaded, but eight rounds of ammunition for it were in a small container on the stock. There was blood on the bed sheet in that bedroom. On the floor near the head of the bed was the victim's cell phone.

After going through the house, Visalia Police Detective Houser returned to the police department and attempted to interview defendant. Houser was unable to obtain a statement the first time he tried; defendant was crying and not responding to any of the questions Houser asked while attempting to advise defendant of his rights. Defendant wept for approximately two hours.

Houser and Sergeant Williams were able to speak to defendant on Houser's second attempt, at which time defendant stated he understood his rights. When Houser asked if defendant had called 911 after Saefong was shot, defendant said he did not. He indicated his cell phone was broken and he was unable to. Houser later checked

5.

defendant's phone; when he dialed 911, he was immediately connected to a highway patrol dispatcher.

During the interview,[5] defendant related that he and Saefong had lived together for seven years and were planning to have another baby. Defendant said what happened was an accident. He related that he always kept all his guns loaded. He and Saefong were at a baptism, and she left earlier than he did. He and Saefong were talking about where they were going the next day, as they kept Sundays just for them and their baby, and they were "about to call it a night." Defendant did not know what happened; the gun "just discharged." Defendant could not believe it, and he kissed Saefong. He was going to take his daughter to the hospital, because he already knew Saefong was not doing good, and he could not make a call from his cell phone because a part had fallen off of it.

Asked if he was playing with or checking the gun, defendant replied, "No. I was just grabbing it to call it a night." He thought he might have "hit the de-cocker and it went off." The gun was on the ironing board in the computer room, and he was picking it up as they were walking back to the bedroom. His daughter was in the same room. He did not know how he was holding the gun; he just grabbed it, headed out to the room, "and bam." Defendant stated he was negligent; he knew better than to leave "that shit" loaded, especially with his daughter there.

Defendant said Saefong liked drinking games, which was what they had been doing at the baptism. His sister and brother-in-law dropped defendant off at the house, and everything happened within a minute of him getting home. He was getting ready to call it a night, and he and Saefong were facing each other when the gun fired. He had walked into the computer room and she came in after him, because they would always kiss and hug when he got home. He usually kept the handgun on top of his closet, but it

---

[5]    Three interviews were videotaped. The first consisted of defendant crying. Portions of each were played for the jury.

was on the ironing board that day because he got off work at midnight and was on the computer all night the night before. The gun had been on the ironing board since the night before the shooting. The gun's 10-round-capacity magazine had seven or eight rounds in it and was in the gun, and a round was in the chamber but the gun was on safety. Defendant did not recall if the hammer was cocked back, but thought it was. The gun could not be on safety when the hammer was cocked back; it had to be decocked. He grabbed it with one hand and suggested to Saefong that they go to the room, then it went off. He gave Saefong two kisses. He could not believe what was happening. The gun was double action, so it had like a hair touch.[6] Defendant had shot the gun before, but not too often and not within the last couple of months. He did not remember if his finger was on the trigger when it went off.

Asked why he did not go to one of the neighbors and have them call someone, defendant said he did not know why. After the accident, however, he just stayed there waiting for the police. He told the people there to call the police and send them to his house.

Defendant professed his love for Saefong. He stated he had offered to marry her numerous times, but she refused because she wanted to finish school first. He denied there had ever been any kind of violence between the two of them. He said the two had not been arguing about anything that day.

An autopsy showed Saefong was shot through the head, with the bullet entering the left forehead near the hairline and exiting the back of her head. Her skull was also fractured. There was no powder tattooing in conjunction with the entrance wound, although there was stippling. This indicated a close range, but not contact, shot.

---

[6] Subsequent testing of the gun, which had a thumb safety, showed that the single action trigger pull (the amount of pressure on the trigger required to fire the weapon) was five to six pounds. Double action was 11 to 12 pounds of pressure. The gun discharged normally in each type of action. The gun did not have a hair trigger.

Dr. Gary Walter opined Saefong possibly would have been able to speak after being shot. The cause of her death was the perforating gunshot wound to the head.

Saefong was four feet seven inches tall. Trajectory analysis and measurements showed the bullet moving left to right, front to back, and at a downward angle of approximately 10 degrees, assuming Saefong was standing upright and her head was straight at the time she was shot. According to Walter, however, most people do not stand in that position for prolonged periods of time, and, if Saefong were holding something in her arms, it would be even less likely that she would have been in that position.

Tom Bevel, an expert in blood stain pattern analysis and crime scene reconstruction, opined that Saefong was standing at the time of the gunshot. From the blood spatter and mist-sized stains on Danielle, he concluded Danielle was in very close proximity to Saefong's entrance wound — most likely in Saefong's left arm, facing the wound — when Saefong was shot, and that Saefong was standing somewhere by a particular chair at the time. Based on the stippling, Bevel estimated the muzzle was approximately 12 inches, but possibly as much as 24 inches, away from Saefong's face when it was fired. He further opined defendant was standing somewhere in the area to the side of the chair. Bevel viewed the videotape in which defendant demonstrated how he removed the weapon from the ironing board; in Bevel's opinion, the manner shown by defendant could not have caused the direction of Saefong's injury. A more likely scenario was a "point shoulder shot" in which the gun was brought up and held straight out and aimed.

Forensic analysis was performed on defendant's cell phone. Although the track ball used for navigating the device was missing, making it difficult to navigate through the phone, the phone was usable. Forensic analysis was also performed on Saefong's cell phone. The analysis showed 13 or 14 calls made between 10:20 p.m. and 10:42 p.m. on August 8 from defendant's cell phone to Saefong's cell phone. Saefong's phone showed

eight missed calls from defendant's phone on August 8, with the first at 11:23 a.m. and the last at shortly after 10:43 p.m.

Friends of defendant and Saefong and members of Saefong's family testified defendant was very familiar with guns and knew how to handle them safely. Defendant obtained the pistol with which Saefong was shot from Saefong's brother in 2007 or 2008; the brother had owned the gun about three years and had fired it about six times, and never had any problems with it. When he gave it to defendant, he showed defendant how to take it apart and clean it and also the safety. Defendant was able to safely handle the weapon.

Friends and family members also testified that defendant and Saefong sometimes argued, mainly about defendant's drinking or his going out and drinking with a friend. Although most never saw anything physical between defendant and Saefong, and Saefong never said anything about defendant threatening her, Saefong's mother once saw defendant grab Saefong's neck and push Saefong into the bedroom. On one occasion when defendant and Saefong had been fighting, defendant angrily remarked to a neighbor that he would love to put her skull in with a baseball bat. Another time, defendant said he would kill Saefong before he ever saw her with somebody else. Sometimes when the couple argued, Saefong would tell her sister that she wanted to throw defendant out of the house, or that she wanted to break up with defendant because of his drinking. Once when the couple was living with Saefong's parents, Saefong asked her mother to kick defendant out of the house. Her mother refused and said it was up to Saefong to get rid of him.

## II

### DEFENSE EVIDENCE

On the day of the shooting, defendant, Saefong, and Danielle attended the baptism of one of defendant's cousins at the home of defendant's aunt in Tulare. A lot of defendant's family was there, and there was drinking and food. Saefong was drinking

and was teaching others how to play a drinking game, although she was not intoxicated.[7] Defendant was also drinking.[8] He and Saefong acted normally toward each other at the party. Saefong only left before defendant because Danielle was tired. Defendant stayed because his grandfather was present and defendant did not get to see him often. Defendant made arrangements for another of his sisters to take him home, and he walked Saefong out to her car when she and Danielle left. He did not seem upset. He left for home about half an hour later, and was very happy on the drive from Tulare to Visalia.

John Jacobson, a private forensic consultant specializing in firearms and crime scene reconstruction, tested the handgun involved in this case and determined it functioned normally. The gun was operable without a magazine in the handle, although it would not typically be fired in that mode. In viewing photographs of the gun taken at the scene, Jacobson opined that what occurred was a jam, not stovepiping.[9] A jam can be caused by a defective cartridge or an impediment to the movement of the gun's slide. In Jacobson's opinion, had a magazine been in the gun when the weapon was fired, the cartridge case would not be seated in the position it was in.

Jacobson took issue with the way the bullet's trajectory and people's positions were determined in this case; in his view, one could not determine where anyone was standing when the bullet was fired because the necessary tests were not done. In

---

[7] Tests performed after her death showed Saefong's blood-alcohol content was zero.

[8] Blood collected from defendant at 2:55 a.m. had an alcohol content of 0.09 percent. If a person stopped drinking at 11:00 p.m., theoretically it would take 45 minutes or an hour for him or her to reach a peak blood-alcohol content. Accordingly, the person would have a blood-alcohol content of approximately .16 percent at midnight. At that level, the person might have problems with decisionmaking and/or motor skills.

[9] "Stovepiping" is a term used when a gun is fired and the cartridge case then gets stuck in the ejection port and so is not completely expelled from the firearm. Causes include cheaply made firearms, dirty firearms, ammunition type, and not having a firm grip on the firearm.

10.

addition, the only way to make an accurate determination with respect to stippling was to conduct tests with the exact same firearm and same type of ammunition that were involved in the shooting. Otherwise, a determination of the weapon's distance was basically just a guess.

Kenton Wong, an expert in blood pattern analysis and crime scene reconstruction, reviewed photographs of the stippling on Saefong and concluded she was not standing up straight when shot. Rather, her head was tilted forward and down slightly. Wong confirmed the only reliable way to determine distance from stippling was to conduct tests using the actual firearm and same type of ammunition. Knowing Saefong's height and assuming her head landed in a particular spot, Wong opined Saefong was standing in the area in front of the chair, near where the clip was located, when shot. The absence of blood on the gun indicated to Wong that the gun was not within a foot of Saefong when it discharged. From blood spatter on Danielle, Wong opined the child was facing the wound and in very close proximity to Saefong when Saefong was shot, and that Saefong was looking toward Danielle.

Wong concluded there was no physical evidence to prove defendant was in a "point shoulder aiming stance" when he fired. Rather, any position imaginable that would align the muzzle of the gun in the proper trajectory (with the bullet going through Saefong's head and into the closet) would work.

Detective Houser reviewed the telephone calls defendant made from jail from August 9 through August 25. The majority, if not all, were to defendant's mother. In a call made on August 9, defendant told his mother the shooting was an accident; he picked the gun up and it fired. Defendant told his mother it happened very quickly, he kissed Saefong twice, and he was going to take his daughter to the hospital.

11.

## DISCUSSION

## I

### INSTRUCTIONAL ERROR

Defendant contends his conviction on count 2 must be reversed because the trial court gave conflicting instructions on the requisite mental state. The Attorney General concedes error occurred, but says it was harmless beyond a reasonable doubt.

### A.    Background

Defendant was charged in count 2 with violating subdivision (a) of section 273a, which provides: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years." The People's theory was that defendant endangered Danielle by means of his conduct toward Saefong.

During the jury instruction conference, the trial court stated it would give CALCRIM No. 225 (circumstantial evidence: intent or mental state). The court then announced it would not give CALCRIM No. 251 (union of act and intent: specific intent or mental state), as that was not the proper instruction. Rather, it would give CALCRIM No. 252 (union of act and intent: general and specific intent together) "because the abuse, child abuse, is a general intent crime."

The jury was subsequently instructed, pursuant to CALCRIM No. 225: "The People must prove not only that the defendant did the acts charged but also that he acted with a particular intent and/or mental state. The instruction for each crime and allegation explains the intent and mental state required." Several instructions later, jurors were told, pursuant to CALCRIM No. 252:

12.

"The crimes and/or allegations charged in Counts 1 and 2 and the lesser included offenses require the union or joint operation of act in [*sic*] wrongful intent.

"*The following crimes and allegations require general criminal intent:  Child abuse* and attempted child abuse.

"For you to find a person guilty of these crimes …, that person must not only commit the prohibited act or fail to do the required act, but must do so with wrongful intent.

"A person acts with wrongful intent when he or she intentionally does a prohibited act or fails to do a required act.  However, it is not required that he or she intend to break the law.  The act required is explained in the instruction for that crime .…

"The following crimes require a specific intent and/or mental state:  Murder, voluntary manslaughter, and involuntary manslaughter."  (Italics added.)

The trial court subsequently instructed the jury on accident or misfortune, first and second degree murder, voluntary manslaughter based on sudden quarrel or heat of passion, and involuntary manslaughter.  In pertinent part, the court instructed that involuntary manslaughter required criminal negligence, and it defined that mental state pursuant to CALCRIM No. 580:  "Criminal negligence involves more than ordinary carelessness, inattention, or mistake in judgment.  [¶]  A person acts with criminal negligence when:  One, he acts in a reckless way that creates a high risk of death or great bodily injury, and; Two, a reasonable person would have known that acting in that way would create such a risk.  In other words, a person acts with criminal negligence when the way he or she acts is so different from the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard to human live [*sic*] or indifference to the consequences of that act."

After instructing on voluntary intoxication, the court turned to count 2.  Pursuant to CALCRIM No. 821, it told jurors in pertinent part:

"The defendant is charged in Count 2 with child abuse likely to produce great bodily harm. To prove that the defendant is guilty of this crime, the People must prove that: One, the defendant while having care or custody of a child willfully caused or permitted the child to be placed in a situation where the child's person or health might have been in danger; Two, the defendant caused or permitted the child to be in danger under circumstances or conditions likely to produce great bodily harm, and; Three, *the defendant was criminally negligent when he caused or permitted the child to be in danger*." (Italics added.)

Jurors were told that someone commits an act willfully "when he or she does it willingly or on purpose," and were given the same definition of criminal negligence as that given with respect to involuntary manslaughter.

## B.     Analysis

"The law imposes on a trial court the sua sponte duty to properly instruct the jury on the relevant law and, as such, requires the giving of a correct instruction regarding the intent necessary to commit the offense and the union between that intent and the defendant's act or conduct. [Citations.]" (*People v. Alvarado* (2005) 125 Cal.App.4th 1179, 1185; see also *People v. Rubalcava* (2000) 23 Cal.4th 322, 333-334.) Because instructions regarding the elements of the crime affect a defendant's substantial rights, defendant did not need to object at trial in order to preserve his claim for appellate review. (§ 1259; *People v. Hillhouse* (2002) 27 Cal.4th 469, 503.)

"Section 273a encompasses a wide variety of situations and includes both direct and indirect conduct. [Citations.] When the harm to a child is directly inflicted, the requisite mental state for the section 273a offense is general criminal intent. [Citations.] When that harm is indirectly inflicted, the requisite mental state is criminal negligence. [Citations.]" (*People v. Burton* (2006) 143 Cal.App.4th 447, 454; see generally *People v. Valdez* (2002) 27 Cal.4th 778, 781, 783-790; *People v. Sargent* (1999) 19 Cal.4th 1206, 1219-1220.)

In the present case, there was no evidence, and the People did not contend, defendant *directly* inflicted harm to Danielle. Accordingly, as the Attorney General

14.

concedes, the trial court erred by instructing jurors, pursuant to CALCRIM No. 252, that child abuse was a general intent crime.  (Cf. *People v. Rogers* (2006) 39 Cal.4th 826, 872-873.)  However, the trial court correctly instructed, pursuant to CALCRIM No. 821, that jurors must find defendant criminally negligent in order to convict him on count 2. Accordingly, the question to be decided is whether the conflicting instructions resulted in prejudice.

Where conflicting instructions on the mental state element of an offense are given, prejudice is assessed under the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18.  (*People v. Lee* (1987) 43 Cal.3d 666, 676; *People v. Chavez* (2004) 118 Cal.App.4th 379, 387.)  Because the conflicting portion of CALCRIM No. 252 could have cancelled out CALCRIM No. 821's correct statement of the required mental state, the potential for prejudice here is the same that arises when jury instructions omit an element of an offense.  (See *People v. Gonzalez* (2012) 54 Cal.4th 643, 662.)  In *Neder v. United States* (1999) 527 U.S. 1 (*Neder*), the United States Supreme Court concluded that in this context, "a demonstration of harmless error [under *Chapman*] does not require proof that a particular jury '*actually* rested its verdict on the proper ground [citation], but rather on proof beyond a reasonable doubt that *a rational jury* would have found the defendant guilty absent the error [citation].  Although the former *can be* proof of the latter [citation], the *Neder* majority made clear that such a determination is not essential to a finding of harmlessness [citation], which instead "will often require that a reviewing court conduct a thorough examination of the record" [citation].'  [Citation.]" (*People v. Gonzalez, supra,* 54 Cal.4th at p. 666; see also *Neder*, *supra*, 527 U.S. at pp. 17-18, 19.)

"We have exhaustively reviewed the trial evidence to determine 'whether the record contains evidence that could rationally lead to a contrary finding with respect to'" the element of criminal negligence.  (*People v. Gonzalez, supra,* 54 Cal.4th at p. 666, quoting *Neder*, *supra*, 527 U.S. at p. 19.)  We have also considered the erroneous

15.

instruction in the context of the instructions as a whole (see *People v. Frye* (1998) 18 Cal.4th 894, 957, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22) and the arguments of counsel to the jury (see *People v. Chavez, supra,* 118 Cal.App.4th at p. 388). We conclude the error was harmless beyond a reasonable doubt.

First, jurors were instructed, pursuant to CALCRIM No. 225, that the instruction *for each crime* explained the required intent and mental state. We believe it reasonably likely jurors — assuming they even realized there was a conflict between CALCRIM Nos. 252 and 821 — concluded CALCRIM No. 821's requirement of criminal negligence prevailed over CALCRIM No. 252's statement of general intent, in light of CALCRIM No. 225. (See *People v. Rogers, supra,* 39 Cal.4th at pp. 873-874.)

Second, and most importantly, the prosecution *and* defense expert witnesses *all* placed Danielle facing the wound, and in very close proximity to Saefong (probably in her arms), when Saefong was shot. Both counsel at least implicitly recognized, in their arguments to the jury, that the child abuse count was inextricably intertwined with the homicide charge. As we have already stated, on the homicide charge, the jury convicted defendant of involuntary manslaughter, a crime requiring criminal negligence. Based on the evidence adduced at trial, no rational jury could have concluded that defendant acted with criminal negligence in shooting Saefong, but not with respect to endangering Danielle. (See *People v. Clark* (2011) 201 Cal.App.4th 235, 251; *People v. Sarkis* (1990) 222 Cal.App.3d 23, 29.)

## II

### SUFFICIENCY OF THE EVIDENCE

With respect to count 2, the jury found true a section 12022.5, subdivision (a) allegation. That provision mandates imposition of a sentence enhancement upon "any person who personally uses a firearm in the commission of a felony .…" Defendant contends the enhancement was not supported by substantial evidence.

16.

The applicable legal principles are clear. The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, *supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125), and applies to enhancements as well as to substantive offenses (*People v. Wilson* (2008) 44 Cal.4th 758, 806).

"'Whether a defendant used a firearm in the commission of an … offense is for the trier of fact to decide. [Citation.]'" (*People v. Wilson, supra,* 44 Cal.4th at p. 806.)[10] "'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding

---

**10**    Although, as defendant notes, it appears the jury in the present case was not provided with a written copy of the pertinent instruction, defendant does not predicate a claim of error on that omission, which did not implicate his state or federal constitutional rights. (*People v. Samayoa* (1997) 15 Cal.4th 795, 845.)

does not warrant the judgment's reversal. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.) Reversal on the ground of insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the enhancement finding. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"Due process requires the prosecution to shoulder the burden of proving each element of a sentence enhancement beyond a reasonable doubt. [Citations.]" (*People v. Tenner* (1993) 6 Cal.4th 559, 566.) Defendant says the evidence in his case is insufficient to sustain the jury's finding that he "used" a firearm within the meaning of section 12022.5, subdivision (a), as there was no evidence he intended to discharge the weapon, and the jury found he did not intentionally kill Saefong or intentionally inflict unjustifiable pain or mental suffering upon Danielle. Defendant argues that "grossly negligent discharge of a firearm which in and of itself is the basis for a child endangerment conviction without any further 'use' of the firearm" does not support an enhancement under the statute.

"By employing the term 'uses' instead of 'while armed' the Legislature requires something more than merely being armed. [Citation.]" (*People v. Chambers* (1972) 7 Cal.3d 666, 672.) "Proof of firearm use during a felony does not require a showing the defendant ever fired a weapon. 'Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies. "Use" means, among other things, "to carry out a purpose or action by means of," to "make instrumental to an end or process," and to "apply to advantage." [Citation.] The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that "uses" be broadly construed.' [Citation.] 'Thus when a defendant deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose

18.

other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure. The defense may freely urge the jury not to draw such an inference, but a failure to actually point the gun, or to issue explicit threats of harm, does not entitle the defendant to a judicial exemption from section 12022.5[, subdivision] (a).' [Citations.]" (*People v. Wilson, supra,* 44 Cal.4th at pp. 806-807, italics omitted.)

The fact that a fatal wound was inflicted by a firearm does not compel the conclusion, as a matter of law, that the defendant was "using" the firearm and so was subject to the enhancement. (See *People v. Doyle* (1958) 162 Cal.App.2d 158, 163.) Rather, personal use — whether by menacing display, firing, or striking with the gun — must be done intentionally. (*People v. Johnson* (1995) 38 Cal.App.4th 1315, 1320.) This does not mean, however, that a section 12022.5, subdivision (a) enhancement requires proof the perpetrator specifically intended to utilize the gun to accomplish the underlying crime; "[a]n intentional use of a firearm in the commission of a crime does not encompass any specific intent." (*People v. Wardell* (2008) 162 Cal.App.4th 1484, 1494.) "A gun use occurs 'in the commission of' an offense if the gun use in fact *objectively facilitated* the commission of the offense. The issue is not one of the gun user's *subjective* mental state but of the *objective role* that the gun use played in the commission of the crime." (*Id.* at p. 1495.)

In the present case, evidence was adduced at trial from which a rational trier of fact could have concluded — not merely speculated (see *People v. Raley* (1992) 2 Cal.4th 870, 891) — that defendant intentionally used a firearm within the meaning of section 12022.5, subdivision (a), whether by firing or menacing display. This evidence included the close-range nature of the shot; the bullet's trajectory; expert opinion that this was a "point shoulder shot," which involves the gun being brought up, held straight out, and aimed; the fact defendant knew how to safely handle firearms; the number of missed calls received by Saefong's cell phone from defendant's cell phone within a short time

before the shooting, together with the fact defendant had been drinking and he and Saefong had argued a number of times in the past about his drinking; defendant's leaving the scene without summoning aid, even though, according to his own statement to police, he knew Saefong was still alive; and defendant's lies to police about not being able to call 911 because his cell phone was broken, where Danielle was at the time the shot was fired, and the amount of pressure needed to fire the gun.

Our concern, when determining whether the evidence was sufficient to support a conviction or finding, is not what this jury *may have* found or not found, but with what a reasonable trier of fact *could* find. (See *People v. Lopez* (1982) 131 Cal.App.3d 565, 569-572.) From the foregoing evidence, a rational juror conceivably could have found defendant acted with express malice toward Saefong. (See *People v. Smith* (2005) 37 Cal.4th 733, 741-742.) The gun need not have been used against Danielle in order for the use to have occurred "in the commission of" the violation of section 273a, subdivision (a). (See *People v. Fierro* (1991) 1 Cal.4th 173, 226-227.)

Defendant says, however, that under the so-called *Toledo* doctrine (*People v. Toledo* (1948) 85 Cal.App.2d 577), the prosecution was bound by defendant's extrajudicial statements that were introduced by the prosecution. Defendant says this is so because those statements were irreconcilable with a theory that defendant displayed the firearm in a menacing manner or intentionally fired the gun, and there was no competent and substantial evidence otherwise. Defendant misperceives the scope and effect of the doctrine.

In *Toledo*, the defendant was charged with murder and convicted of manslaughter. He admitted striking the fatal blow, but claimed self-defense. The physical evidence was consistent with his version of events. Construing former section 1105,[11] the appellate

---

[11]     See now section 189.5. Subdivision (a) of this statute, which is substantively unchanged from subdivision (a) of former section 1105, provides: "Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of

court held a defendant need only raise a reasonable doubt with respect to self-defense; the defendant's statement did so; and there was no rational way to believe the defendant's concession that he struck the victim, yet reject the remaining exculpatory portion of his statement. Accordingly, the appellate court ruled, the record did not support the defendant's manslaughter conviction. (*Toledo*, *supra*, 85 Cal.App.2d at pp. 579-582.)

Based on *Toledo*, it has been stated that "if the prosecution presents as a part of its case a statement of the defendant evidencing justification for the alleged crime, the prosecution is bound by that evidence in the absence of proof to the contrary. [Citations.]" (*People v. Griego* (1955) 136 Cal.App.2d 51, 56; see *People v. Acosta* (1955) 45 Cal.2d 538, 542-543.) In *People v. Burney* (2009) 47 Cal.4th 203, however, the California Supreme Court referred to the *Toledo* doctrine as "an antiquated and questionable statement of the law." (*People v. Burney, supra,* at p. 248.) The high court stated: "Opinions rendered by the Courts of Appeal subsequent to *Toledo* demonstrate that its holding has been superseded at least in part. 'First, the so-called *Toledo* doctrine (whose genesis seems to have been merely an argument offered on appeal) actually refers to a principle of judicial review invoked in homicide prosecutions obviating a defendant's burden of showing mitigation or justification where the prosecution's proof itself tends to show same or a lesser unlawful homicide. [Citations.] … To the extent that the doctrine is founded upon a notion that the prosecution is bound by their witnesses' statements [citation] on the antiquated theory of vouchsafing one's own witnesses [citation], that theory has long since been discarded in favor of the modern rule allowing impeachment of a witness by any party, "including the party calling him." [Citations.] In the final

proving circumstances of mitigation, or that justify or excuse it, devolves upon the defendant, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable."

21.

analysis the question of defendant's guilt must be resolved from *all* the evidence considered by the jury.' [Citation.]" (*Ibid.*)

"[C]redibility is governed by more than just the words transcribed by a court reporter. A trier of fact is free to disbelieve a witness, even one uncontradicted, if there is any rational ground for doing so. [Citations.]" (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043.) Here, there was physical and other evidence from which a rational juror could have disbelieved defendant's statements to police, and found instead that he intentionally "used" a firearm in a manner that brought him within the ambit of section 12022.5, subdivision (a).

That such a conclusion might be inconsistent with the jury's involuntary manslaughter verdict is immaterial. "It is well established that, under section 954, inconsistent verdicts are allowed to stand if the verdicts are otherwise supported by substantial evidence. [Citation.]" (*People v. Miranda* (2011) 192 Cal.App.4th 398, 405; accord, *People v. Santamaria* (1994) 8 Cal.4th 903, 911; see also *United States v. Powell* (1984) 469 U.S. 57, 66-67.)[12] "The rule applies equally to inconsistent enhancement findings [citation], and to an enhancement finding that is inconsistent with the verdict on a substantive offense [citation]." (*People v. Miranda, supra,* 192 Cal.App.4th at p. 405.) "'Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support *any* rational determination of guilty beyond a reasonable doubt. [Citations.] This review should be independent of the jury's determination that evidence on another count was insufficient.' [Citation.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 656, italics added, quoting *United States v. Powell, supra,* 469 U.S. at p. 67.)

---

**12** Section 954 provides, in pertinent part: "An acquittal of one or more counts shall not be deemed an acquittal of any other count."

22.

Finally, there is the question whether the discharge of a firearm, which is itself the basis for conviction under section 273a, subdivision (a), can support a sentence enhancement under section 12022.5, subdivision (a) without any further use of the firearm. In other words, can the same firearm use be the basis for both the substantive offense and the enhancement? We conclude that it can. Section 12022.5, subdivision (a) mandates imposition of a sentence enhancement for personal use of a firearm in the commission of a felony "unless use of a firearm is an element of that offense." "The phrase 'element of the offense' signifies an essential component of the legal definition of the crime, *considered in the abstract*. [Citations.]" (*People v. Hansen* (1994) 9 Cal.4th 300, 317, overruled on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1199; accord, *People v. Smith* (2007) 150 Cal.App.4th 89, 94-95; *People v. Ross* (1994) 28 Cal.App.4th 1151, 1156.) Although here defendant violated section 273a, subdivision (a) by means of a firearm, the offense obviously can be committed without the use of any weapon at all. (See *People v. Smith, supra,* 150 Cal.App.4th at p. 95.) "Under section 12022.5, subdivision (a), the enhancement applies unless 'use of a firearm is an element of the offense,' and not merely the means by which the offense was committed or the factual predicate of a theory upon which the conviction was based. [Citations.]" (*People v. Hansen, supra,* 9 Cal.4th at p. 317.)

### III

#### SENTENCING AND RELATED ERRORS

A. **Imposition of Upper and Consecutive Terms**

The sentence range faced by defendant for involuntary manslaughter was two, three, or four years. (§ 193, subd. (b).)[13] The sentence range he faced for child abuse

---

[13] Involuntary manslaughter is now punished pursuant to section 1170, subdivision (h) rather than by imprisonment. In light of the remainder of the sentence imposed on defendant, we are not concerned with sentencing under so-called

23.

was two, four, or six years. (§ 273a, subd. (a).) The sentence range he faced for the firearm use enhancement was three, four, or 10 years. (§ 12022.5, subd. (a).)

Prior to sentencing, the prosecutor filed a statement in aggravation that requested imposition of the maximum aggregate term of 17 years, calculated as the aggravated term of six years on count 2, plus the aggravated term of 10 years for the enhancement, plus a consecutive term of one year (one-third of the middle term) on count 1. After arguing against a grant of probation, the prosecutor asserted there were no factors in mitigation, but several in aggravation: the crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, and callousness (Cal. Rules of Court,[14] rule 4.421(a)(1)); the victim was particularly vulnerable (rule 4.421(a)(3)); the manner in which the crime was carried out indicated planning (rule 4.421(a)(8)); defendant took advantage of a position of trust and confidence to commit the offense (rule 4.421(a)(11)); and defendant engaged in violent conduct that indicated a serious danger to society (rule 4.421(b)(1)). The prosecutor further argued absence of remorse and the danger posed by defendant (see rule 4.408(a)).

Defense counsel filed a statement in mitigation, together with supporting letters, in which he asked the court to grant probation or, alternatively, to sentence defendant to the mitigated term for the offenses. After discussing the criteria affecting probation, defense counsel asserted the following circumstances in mitigation existed: defendant was a passive participant or played a minor role in events (rule 4.423(a)(1)); although the victims were not initiators of the crime, Saefong willingly placed herself in proximity to a loaded weapon (rule 4.423(a)(2)); the crime was committed due to an unusual circumstance (an accident) not likely to recur (rule 4.423(a)(3)); although defendant was

---

realignment, and defendant appropriately does not claim he was entitled to serve his sentence in county jail rather than state prison.

[14] All references to rules are to the California Rules of Court.

24.

not induced by others to participate in the crime, his level of intoxication contributed to his negligence in handling the weapon (rule 4.423(a)(4)); defendant had an insignificant record of criminal conduct (rule 4.423(b)(1)); and defendant always admitted this was an accident, a claim with which the jury agreed (rule 4.423(b)(3)).  In aggravation, defense counsel conceded Danielle was under two years of age, and defendant's handling of the firearm was negligent and put her in grave danger (rule 4.421(a)(3)).

The probation officer's report (RPO) showed defendant, who was 26 years old when interviewed for the report, had a juvenile record consisting of two separate offenses — battery (fight at school) and disturbing the peace — and an adult record consisting of a 2005 misdemeanor violation of section 415, which resulted in a fine.  Defendant denied any gang affiliation, although jail records indicated he was a Northern gang dropout.  Defendant admitted last using marijuana when he was 14, denied the use of other drugs, and admitted first using alcohol at age 14 and drinking a 12-pack on a weekly basis at the time of his arrest.  The RPO reflected defendant was employed at the time of the offense, and had a steady employment history as an adult.  After discussing criteria affecting probation, the RPO related there were no factors in mitigation.  In aggravation, the RPO recited the fact the crime involved great violence, great bodily harm, the threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (rule 4.421(a)(1)), and the fact defendant had engaged in violent conduct, indicating a serious danger to society (rule 4.421(b)(1)).  The RPO recommended imposition of the four-year middle term on both count 2 and the firearm use enhancement, plus a consecutive term of one year on count 1, for a total of nine years in prison.

At sentencing, the trial court stated it had read the RPO, the parties' written statements, and letters that had been submitted.  Both parties submitted the matter on their respective written statements.  Several of Saefong's family members spoke, as did defendant.  This ensued:

25.

"[THE COURT:]  All right.  Having heard the statements from the family members, having read the letters, having read the probation report, this Court is not in agreement with the probation recommendation.  This Court believes that there are no factors in mitigation, that the factors in aggravation justify an aggravated term.

"The defendant -- the jurors saw this as a manslaughter, and the Court certainly is not going to dispute what the jurors found.  They found what they found, but the jurors also found that the defendant endangered the health and safety of this child.  And that carries up to a maximum of six years along with ten years for the use of a gun.

"This house was full of firearms.  Everywhere you turned there was a firearm.  There was ammunition.  There were firearms in cases.  There were firearms out of cases.  There was a loaded firearm on an ironing board.  And that's the firearm that was used to kill the mother of this child.  The defendant knew firearms, knew how they worked, was very familiar with them.  Photos were shown with the defendant with a variety of firearms.  The defendant went to the range, knew how to use firearms.  The idea that a person knowing firearms as the defendant in this Court's opinion obviously did -- would turn with a firearm off safety, chambered and fire a round into the head of a victim holding a child is almost beyond belief.

"The defendant had the opportunity to render aid to this victim that he claims accidentally was shot.  Instead of that, he fled the scene.

"He lied to law enforcement when they asked him why he didn't call 911.  He said his phone didn't work.  That was a lie.  His phone did work.  You could phone 911.  It was checked.  And rather than render aid to this victim, he fled the scene and lied to law enforcement.

"The aggravating factors justify an aggravated term.

"In Count 2, the defendant's application for probation is denied.  He's committed to state prison for the aggravated term of six years plus an additional consecutive ten years with credits .…

"In Count 1, he's committed to state prison for one-third the midterm --

"[DEFENSE COUNSEL]:  Your Honor, on those credits, I just want to update them .…

"THE COURT:  Oh.  Thank you, Counsel.  [¶] … [¶]  Thank you, Counsel, for catching that.…  [¶] … [¶]  … In Count 1, he's committed to

state prison for one-third the midterm of one year. [¶] … [¶] That's consecutive to Count 2 .…"

Defendant now contends he is entitled to be resentenced, because the reasons stated for imposing the upper term were not reasonably related to the offense and constituted dual use of facts.

As a preliminary matter, the Attorney General says defendant's claims were forfeited by defendant's failure to object at sentencing. (See *People v. Scott* (1994) 9 Cal.4th 331, 353-355 (*Scott*).) Defendant concedes the lack of objection, but says it should not result in forfeiture because the trial court did not provide any indication of the reasons upon which it would rely before pronouncing judgment, and it did not allow counsel to interrupt while judgment was being pronounced.

The California Supreme Court has explained that "the *Scott* rule applies when the trial court 'clearly apprise[s]' the parties 'of the sentence the court intends to impose and the reasons that support any discretionary choices' [citation], and gives the parties a chance to seek 'clarification or change' [citation] by objecting to errors in the sentence. The parties are given an adequate opportunity to seek such clarifications or changes if, at *any time* during the sentencing hearing, the trial court describes the sentence it intends to impose and the reasons for the sentence, and the court thereafter considers the objections of the parties before the actual sentencing. The court need not expressly describe its proposed sentence as 'tentative' so long as it demonstrates a willingness to consider such objections.… [¶] It is only if the trial court fails to give the parties any meaningful opportunity to object that the *Scott* rule becomes inapplicable." (*People v. Gonzalez* (2003) 31 Cal.4th 745, 752.)

Here, the trial court gave no indication it intended to depart from the probation officer's recommended sentence or the aggravating factors listed in the RPO, until it was already in the process of pronouncing judgment. On the other hand, the court showed itself willing to entertain defense counsel's argument regarding time credits, even though

27.

that argument was presented by way of interruption. (See *People v. Downey* (2000) 82 Cal.App.4th 899, 916.)

Under the circumstances, we find it likely, albeit not certain, the trial court would have considered objections to the manner in which it made or articulated its discretionary sentencing choices. (See *Scott*, *supra*, 9 Cal.4th at p. 353.) However, in light of defendant's alternative claim that trial counsel's failure to object constituted ineffective assistance of counsel, as well as our inherent authority to address the issue even if forfeited (*People v. Williams* (1998) 17 Cal.4th 148, 161-162, fn. 6), we find it appropriate to review defendant's claims on the merits rather than finding them forfeited.

Section 1170 affords a trial court broad discretion in imposing sentence. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.) "[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered. [Citations.]" (*People v. Giminez* (1975) 14 Cal.3d 68, 72.) "[A] trial court will abuse its discretion … if it relies upon circumstances that are not relevant to the decision or that otherwise constitute an improper basis for decision. [Citations.]" (*People v. Sandoval, supra,* 41 Cal.4th at p. 847.) Absent a clear showing of abuse, a trial court's discretion in sentencing will not be disturbed on appeal. (*People v. Sanchez* (1982) 131 Cal.App.3d 718, 740.) Moreover, a sentencing court is presumed to have acted properly, absent a clear showing that its sentence choice is arbitrary or irrational. (*People v. Hubbell* (1980) 108 Cal.App.3d 253, 260.)

"The statutes and sentencing rules generally require the court to state 'reasons' for its discretionary choices on the record at the time of sentencing. [Citations.]" (*Scott*, *supra*, 9 Cal.4th at p. 349; see also *People v. Sandoval, supra,* 41 Cal.4th at p. 847.) "Such reasons must be supported by a preponderance of the evidence in the record and must 'reasonably relat[e]' to the particular sentencing determination. [Citations.]" (*Scott*, *supra*, 9 Cal.4th at pp. 349-350, fn. omitted.) "The relevant circumstances may be obtained from the case record, the probation officer's report, other reports and statements

properly received, statements in aggravation or mitigation, and any evidence introduced at the sentencing hearing."  (Rule 4.420(b).)

"[I]n assessing factors in aggravation or in mitigation the sentencing court not only may but must examine all of the circumstances of the crime.  [Citations.]  '[T]he "circumstances" the sentencing judge may look to in aggravation or in mitigation of the crime include "attendant facts," "the surroundings at the commission of an act." [Citation.]  "Circumstances" include "practically everything which has a legitimate bearing" on the matter in issue.  [Citations.]'  [Citation.]"  (*People v. Blade* (1991) 229 Cal.App.3d 1541, 1544.)

As this court has explained, because "[n]either section 1170 nor the California Rules of Court attempt to provide an inclusive list of aggravating circumstances … a trial court is free to base an upper term sentence upon any aggravating circumstance that (1) the court deems significant and (2) is reasonably related to the decision being made. [Citations.]"  (*People v. Moberly* (2009) 176 Cal.App.4th 1191, 1196.)  In this respect, "'[t]he essence of "aggravation" relates to the effect of a particular fact in making the offense distinctively worse than the ordinary.'  [Citation.]"  (*People v. Rodriguez* (1993) 21 Cal.App.4th 232, 241; accord, *People v. Black* (2007) 41 Cal.4th 799, 817.)

A single factor may be relevant to more than one sentencing choice.  (*Scott*, *supra*, 9 Cal.4th at p. 350.)  For example, only a single aggravating factor is required to impose one or more upper terms or to impose one or more consecutive sentences, so long as that fact is reasonably related to each count for which it is used.  (*People v. Osband* (1996) 13 Cal.4th 622, 728-729; *People v. Robinson* (1992) 11 Cal.App.4th 609, 616, disapproved on another ground in *Scott*, *supra*, 9 Cal.4th at p. 353, fn. 16; *People v. Price* (1984) 151 Cal.App.3d 803, 812.)  On the other hand, "such dual or overlapping use is prohibited to some extent."  (*Scott*, *supra*, 9 Cal.4th at p. 350.)  Thus, a court cannot use a single fact both to impose the upper term and to impose an enhancement (§ 1170, subd. (b); *Scott*, *supra*, 9 Cal.4th at p. 350; rule 4.420(c)), or to impose the upper term and a consecutive

29.

sentence (*People v. Osband, supra,* 13 Cal.4th at p. 728). Similarly, a fact that constitutes an element of the offense may not be used to aggravate or enhance a sentence. (*Scott*, *supra*, 9 Cal.4th at p. 350; rule 4.420(d).) A court can, however, use the same fact or facts to aggravate both the base term for an offense and the sentence on an enhancement. (*People v. Moberly, supra,* 176 Cal.App.4th at p. 1198.)

In the present case, the trial court did not make clear which of the reasons it found significant related to which discretionary sentencing decision(s). Assuming there was improper dual use of facts or reliance on factors not reasonably related to a particular sentencing choice, however, we see no cause for remand. "When a trial court has given both proper and improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper. [Citation.]" (*People v. Price* (1991) 1 Cal.4th 324, 492.) It is readily apparent, from the trial court's comments, that it intended to impose the maximum sentence possible; the factors it identified and that are shown by the record permitted it to do so without running afoul of the various sentencing rules. (See *People v. Avalos* (1984) 37 Cal.3d 216, 233; *People v. Moreno* (1982) 128 Cal.App.3d 103, 110.)

The record supported the trial court's statement that the house was full of firearms and ammunition, and that there was a loaded firearm on the ironing board. In our view, under the circumstances of this case, these factors were directly related to the child abuse count and the firearm use enhancement. That they are not factors in aggravation listed in the rules of court is immaterial. (*People v. Black, supra,* 41 Cal.4th at p. 817; rule 4.408(a).) They were not elements of the substantive offense or the enhancement; "[a] sentencing factor is an element of the offense if the crime *as defined by statute* cannot be accomplished without performance of the acts which constitute such factor. [Citations.]" (*People v. Clark* (1992) 12 Cal.App.4th 663, 666, italics added.) Moreover, they had the

30.

effect of making the offense worse than the ordinary (*People v. Black, supra,* 41 Cal.4th at p. 817), because they created a tragedy waiting to happen.

Defendant says the court's reliance on how defendant handled the gun — turning with the gun off safety and with a round chambered, and firing a bullet into the head of a victim — was essentially the grossly negligent handling of the firearm, and could not be used to support the upper term for child abuse because of the firearm enhancement attached to that offense. Assuming he is correct, the trial court identified other, valid factors supporting imposition of the aggravated term for child abuse, as we have just explained.

Defendant further says grossly negligent discharge of the firearm does not properly support the upper term for the firearm enhancement, because the reckless mishandling of the firearm did not make the firearm use distinctively worse than the ordinary. Defendant relies on *People v. Rodriguez, supra,* 21 Cal.App.4th at pages 241-242, in which the Court of Appeal found improper the trial court's reliance, in imposing an aggravated term for a firearm use enhancement, on the fact the gun misfired and the defendant had to rerack.

We are not convinced. "The gun use enhancement is applicable to all uses of a weapon, from the most 'benign' display to the most heinous confrontation." (*People v. Sandoval* (1994) 30 Cal.App.4th 1288, 1301.) Here, the evidence at trial showed defendant did not merely possess or display the handgun, he *fired* it, even if unintentionally. (See *People v. Douglas* (1995) 36 Cal.App.4th 1681, 1691; *People v. Mustafaa* (1994) 22 Cal.App.4th 1305, 1312.) The trial court's comments indicate a finding of circumstances beyond what was necessary for finding use of the gun or, for that matter, criminal negligence. (See *People v. Douglas, supra,* 36 Cal.App.4th at p. 1691.)

Moreover, as conceded by defendant in his statement in mitigation, Danielle was a particularly vulnerable victim, a fact that constitutes a circumstance in aggravation under

rule 4.421(a)(3). Defendant now takes issue with this position, arguing that because the underlying offense by its nature presumes a vulnerable victim, Danielle was not "particularly" vulnerable.

We disagree. "[A]ggravating a sentence due to 'particular vulnerability,' where vulnerability is based *solely* on age, is improper when age is an element of the offense. [Citations.]" (*People v. Dancer* (1996) 45 Cal.App.4th 1677, 1693-1694, disapproved on another ground in *People v. Hammon* (1997) 15 Cal.4th 1117, 1123; accord, *People v. Alvarado* (2001) 87 Cal.App.4th 178, 195.) "However, 'particular vulnerability' is determined in light of the 'total milieu in which the commission of the crime occurred ….' [Citation.]" (*People v. Dancer, supra,* 45 Cal.App.4th at p. 1694; accord, *People v. Ramos* (1980) 106 Cal.App.3d 591, 607, disapproved on another ground in *Scott, supra*, 9 Cal.4th at p. 353, fn. 16.) Danielle was a mere toddler in her mother's arms — the place she should have been the safest. Since she was facing the wound, her back most likely was to defendant, whom she had no reason to fear or mistrust and as to whom she was in close proximity, and so she had no warning anything was amiss. The combination of circumstances supports a finding of particular vulnerability (see *People v. Alvarado, supra,* 87 Cal.App.4th at p. 195; *People v. Dancer, supra,* 45 Cal.App.4th at p. 1694; cf. *People v. Weaver* (2007) 149 Cal.App.4th 1301, 1316), which is reasonably related to both the child abuse count and the firearm use enhancement.[15]

From the foregoing, it is clear the trial court found ample valid aggravating circumstances to justify imposition of the upper term on both the child abuse count and the attendant firearm use enhancement. Defendant admits the court's finding he acted with callousness toward Saefong by fleeing the scene without rendering aid or

---

**15** Although not mentioned by the trial court, the record also showed defendant's criminal conduct was of increasing seriousness. (Rule 4.421(b)(2); see, e.g., *People v. Piceno* (1987) 195 Cal.App.3d 1353, 1360; *People v. Kellett* (1982) 134 Cal.App.3d 949, 962; *People v. Ramos, supra,* 106 Cal.App.3d at p. 610.)

32.

summoning rescuers (rules 4.421(a)(1), 4.425(b)) "arguably" supports the imposition of a consecutive term for involuntary manslaughter. We agree, and find nothing "arguabl[e]" about the matter. Since this factor need not be used to justify imposition of an upper term, it is available for the purpose of imposing a consecutive term. In addition, imposition of a consecutive term was warranted by the existence of multiple victims. (See, e.g., *People v. Calhoun* (2007) 40 Cal.4th 398, 408; *People v. Gutierrez* (1992) 10 Cal.App.4th 1729, 1739; *People v. Leung* (1992) 5 Cal.App.4th 482, 504.)

Defendant argues for a remand for resentencing in light of what he calls "significant" mitigating circumstances. He points to his minimal prior record, his history of steady employment, his lack of current gang affiliation or substance abuse problems, the fact the offenses were committed under unusual circumstances that were unlikely to recur, and the fact he voluntarily acknowledged wrongdoing at an early stage of the proceedings.

A trial court is deemed to have considered all relevant criteria contained in the sentencing rules, unless the record affirmatively reflects otherwise. (Rule 4.409; *People v. White* (1981) 117 Cal.App.3d 270, 280, disapproved on another ground in *Scott*, *supra*, 9 Cal.4th at p. 353, fn. 16.) Here, a number of purportedly mitigating factors were before the court through defendant's statement in mitigation; if there were other factors defendant wished the court to consider, those factors should have been included.

"A sentencing court errs in disregarding an undisputed factor in mitigation. [Citation.] However, many alleged factors in mitigation are disputable either because they may not be established by the evidence or because they may not be mitigating under the circumstances of a particular case. Where an alleged factor in mitigation is disputable, the court may find an absence of mitigating factors and need not explain the reason for its conclusion. [Citations.]" (*In re Handa* (1985) 166 Cal.App.3d 966, 973.) Additionally, the weighing of factors in aggravation and mitigation involves a flexible quantitative and qualitative approach (*People v. Thornton* (1985) 167 Cal.App.3d 72, 77),

33.

and a court may properly determine that a factor's mitigating influence is small (*People v. Lambeth* (1980) 112 Cal.App.3d 495, 500; *People v. Regalado* (1980) 108 Cal.App.3d 531, 539) or nonexistent (*People v. Salazar* (1983) 144 Cal.App.3d 799, 813).

The mere assertion of a mitigating factor does not establish that factor. (*People v. Lambeth*, *supra*, 112 Cal.App.3d at p. 500.) It is for the sentencing court to determine what, if any, factors in mitigation are established, and thus whether conduct was excused or culpability reduced, based on the facts and circumstances of each case. (*People v. Regalado, supra,* 108 Cal.App.3d at p. 538.) Under the circumstances in this case, we cannot say the trial court abused its discretion in concluding there were no factors in mitigation. (See *People v. Holguin* (1989) 213 Cal.App.3d 1308, 1318.)

"Each of the aggravating factors were supported by the record. Even if we were to assume that [some] constituted a dual use of facts and should have been excluded, the remaining factors were more than sufficient to impose the [upper and consecutive] term[s] .… We are confident that, under the circumstances, an order of remand for a clarified statement of reasons [or resentencing] would be no more than an idle act. [Citation.]" (*People v. Williams* (1996) 46 Cal.App.4th 1767, 1782-1783.)

## B.    Presentence Credits

At sentencing, defendant was awarded 851 days of actual presentence credits, plus 127 days of local conduct credits, for a total of 978 days. He now says that, because he was arrested on August 8, 2009, he is entitled to one additional day of actual credit.

Section 2900.5, subdivision (a), provides in pertinent part: "In all felony … convictions, … when the defendant has been in custody, including, but not limited to, any time spent in a jail … or similar residential institution, all days of custody of the defendant … shall be credited upon his or her term of imprisonment .…" Subdivision (d) of the statute places upon the court imposing sentence the duty "to determine the date or dates of any admission to, and release from, custody prior to sentencing and the total number of days to be credited pursuant to this section."

In *People v. Ravaux* (2006) 142 Cal.App.4th 914 (*Ravaux*), the court held: "[A] defendant is not in custody within the meaning of section 2900.5 prior to being processed into a jail or similar custodial situation as described in" subdivision (a) of the statute. Accordingly, a defendant's custody credits are to be calculated beginning when the defendant was booked into jail rather than from the time of his or her arrest. (*Ravaux*, *supra*, at p. 919.) The court examined the wording of the statute, and concluded: "The plain language of section 2900.5 addresses only residential custody arrangements and makes no mention of detention, seizure or arrest by the police as being the type of custody included in the calculation of custody credits.… Arrest or detention by police prior to booking is not mentioned anywhere in section 2900.5. It is clear from the plain language of the statute that custody credits are to be given for time spent within a residential detention facility, not for merely being in the custody of police." (*Id*. at pp. 919-920.)

We agree with *Ravaux*. The only reasonable reading of section 2900.5, subdivision (a) is that it is limited to time spent in custody in a jail or similar residential institution. This is consistent with the California Supreme Court's longstanding pronouncements concerning the statute's purpose. (See, e.g., *People v. Riolo* (1983) 33 Cal.3d 223, 228 [§ 2900.5 helps equalize actual time *served* in custody and reflects basic philosophy that when a person *is incarcerated*, he is being punished]; *In re Rojas* (1979) 23 Cal.3d 152, 156 [original wording of statute provided for credit for all days defendant spent *in jail* prior to sentencing; statute was subsequently extended in recognition that defendants may be in pretrial custody *in institutions* other than jails for reasons other than indigence].)

As noted in *Ravaux*, granting custody credit beginning at the time of arrest does not further the purposes for which section 2900.5 was adopted. (*Ravaux*, *supra*, 142 Cal.App.4th at p. 920.) Moreover, it would lead to absurd results. "[A] defendant would be eligible for a day of custody credit on occasions when he was detained by the police

35.

and questioned, but released without being booked into jail.  In the course of an ongoing criminal investigation a defendant may be contacted and questioned by police several times, each time potentially putting the defendant in custody .…  Because defendants are given credit based on the number of days in custody rather than the number of 24-hour periods, a full day would be credited regardless of the actual length of the detention.  [Citation.]  Further ambiguity would be created by virtue of the court having to review in detail the circumstances surrounding the detention of a defendant, possibly on more than one occasion and for varying reasons, in order to determine at what time or times he was placed into custody and whether that custody was related to the offense for which he was convicted.  By contrast, the booking of a suspect into jail represents a bright line for trial courts to begin counting credits." (*Id*. at p. 921.)

Defendant acknowledges *Ravaux*, but says the record clearly shows he was arrested on August 8, 2009, and fails to establish he was not booked until after midnight.  To the contrary, the RPO shows defendant was in custody of the Tulare County Jail beginning August 9, 2009.  That he may have been in police custody prior to midnight, while coincidentally being questioned at the jail, does not change section 2900.5's applicability.  The trial court properly awarded credit calculated from August 9, 2009. (See *People v. Macklem* (2007) 149 Cal.App.4th 674, 702.)[16]

## C.    **Clerical Error in Abstract of Judgment**

The abstract of judgment originally showed defendant was convicted, in count 1, of involuntary manslaughter, but it incorrectly specified subdivision (a) of section 192, rather than subdivision (b) of that statute.  The trial court issued an amended abstract

---

[16]    We note that defense counsel, in informing the trial court of defendant's updated credits during sentencing, also calculated from the August 9, 2009, date.  If defendant now believes that date was incorrect and he was in fact booked into jail on August 8, 2009, he is free to seek relief in the trial court.  (See *People v. Acosta* (1996) 48 Cal.App.4th 411, 428, fn. 8.)

36.

correcting that error, but the amended abstract still erroneously had an "X" in the box labeled "CONSECUTIVE 1/3 VIOLENT." The parties agree the box that should be checked is the one labeled "CONSECUTIVE 1/3 NON-VIOLENT." (See § 667.5, subd. (c)(1), (8).) We will direct the trial court to correct this clerical error. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185; *In re Candelario* (1970) 3 Cal.3d 702, 705.)

**D.** **Description of Count 2 as "Child Abuse"**

Last, defendant seeks to have the record reflect that he was convicted in count 2 of child *endangerment*, rather than child *abuse*.[17] He says child endangerment is a "more accurate and fair description of the offense," because his conviction clearly rested on indirect or passive conduct.

While we agree defendant did not directly abuse Danielle, we decline to order any change. Defendant was charged with, convicted of, and sentenced for "child abuse." We do not believe the description of the offense as "child abuse" is erroneous. In *People v. Sargent*, *supra*, 19 Cal.4th 1206, the California Supreme Court observed that the statute could be violated by "'both active and passive conduct, i.e., *child abuse* by direct assault and *child endangering* by extreme neglect.' [Citation.]" (*Id*. at pp. 1215-1216, italics added.) In the very next paragraph, however, the high court referred to the latter form as "indirect *abuse* or child endangerment." (*Id*. at p. 1216, italics added.) A concurring opinion in the same case referred to all branches of the statute as proscribing "felony child *abuse*." (*Id*. at pp. 1225, 1226, italics added (conc. opn. of Mosk, J.).) By contrast, the appellate court in *People v. Felton* (2004) 122 Cal.App.4th 260, 269 termed a violation of the statute in general "felony child *endangerment*." (Italics added.) Thus,

---

**17** In his opening brief, defendant asks us to modify the judgment accordingly. In his reply brief, although the heading of his argument still says the judgment should be modified, he says he is only requesting correction of a clerical entry on the abstract of judgment.

while it would have been correct to describe count 2 as "child endangerment" in the present case, it was not *in*correct to describe it as "child abuse."

Defendant points to no disabilities he currently suffers, or is likely to suffer in the future, as a result of the offense being so described. He speculates that he might be subjected to unjust penal consequences in the future, because a certified abstract of judgment is generally admissible to prove the nature of an offense when a prior conviction is charged. (*People v. Delgado* (2008) 43 Cal.4th 1059, 1066.) Perhaps, he posits, although neither child abuse nor child endangerment is presently listed as a "'violent'" felony under section 667.5, subdivision (c) or a "'serious'" felony under section 1192.7, subdivision (c), those statutes could be amended in the future to provide such designations for "child abuse" but not "child endangerment."

In *People v. Delgado*, *supra*, 43 Cal.4th at page 1066, the California Supreme Court explained:

> "A common means of proving the fact and nature of a prior conviction is to introduce certified documents from the record of the prior court proceeding and commitment to prison, including the abstract of judgment describing the prior offense. [Citations.] [¶] … [¶]
>
> "Thus, if the prosecutor presents, by such records, prima facie evidence of a prior conviction that satisfies the elements of the recidivist enhancement at issue, *and if there is no contrary evidence*, the fact finder, utilizing the official duty presumption, may determine that a qualifying conviction occurred. [Citations.]
>
> "However, *if the prior conviction was for an offense that can be committed in multiple ways, and the record of the conviction does not disclose how the offense was committed, a court must presume the conviction was for the least serious form of the offense*. [Citations.] In such a case, *if the statute under which the prior conviction occurred could be violated in a way that does not qualify for the alleged enhancement, the evidence is thus insufficient*, and the People have failed in their burden. [Citations.]" (Italics added.)

38.

It would thus seem defendant will be adequately protected should the consequences he hypothesizes ever come about. No doubt he will be able to avail himself of other remedies as well, to ensure he is subject in the future only to those consequences that are based on his true circumstances.

There being no error, there is nothing to correct.

## DISPOSITION

The judgment is affirmed. The trial court is directed to cause to be prepared an amended abstract of judgment, showing count 1 (involuntary manslaughter) as "CONSECUTIVE 1/3 NON-VIOLENT," and to forward a certified copy of same to the appropriate authorities.

_____
DETJEN, J.

WE CONCUR:

_____
GOMES, Acting P.J.

_____
PEÑA, J.

39.